S. FRANK HARRELL – SBN 133437
sharrell@lynberg.com
JESSE K. COX - 285218
jcox@lynberg.com
MARLENA R. MLYNARSKA – 328132
mmlynarska@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendant DEBRA FINLEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY GORDON. successor-in-interest for decedent, Matthew Shawn Gordon, individually,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE; ORANGE COUNTY SHERIFF'S DEPARTMENT; ORANGE COUNTY SHERIFF-CORONER SANDRA HUTCHENS; ORANGE COUNTY CENTRAL MEN'S JAIL; ORANGE COUNTY HEALTH CARE AGENCY, and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 8:14-cv-01050-CJC-DFM<br><br>*Assigned to:*<br>*Hon. Cormac J. Carney – Courtroom 9B*<br><br>**DEFENDANT DEBRA FINLEY'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE; DECLARATION OF JESSE K. COX; EXHIBITS; [PROPOSED] ORDER**<br><br>FPTC:    May 23, 2022<br>Time:    3:00 p.m.<br>Courtroom:    9B<br><br>Trial Date:    June 7, 2022<br>Complaint filed:    July 9. 2014 |

1

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1  **TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF**

2  **RECORD:**

3      **PLEASE TAKE NOTICE** that at the Pretrial Conference on May 23, 2022,

4  at 3:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 9B of

5  the above-entitled Court, located at 411 West Fourth Street, Santa Ana, CA 92701,

6  Defendant DEBRA FINLEY ("Defendant") will, and hereby does, move the Court

7  in limine, before jury selection or commencement of trial, for an order that Plaintiff

8  be precluded from referring to, or using any pleading, testimony, remarks, questions,

9  or arguments which might inform the jury of the following facts or circumstances

10  which are irrelevant and immaterial to this suit, and which are unreasonably

11  prejudicial, namely:

12          Evidence and/or argument that internal Orange County policy,
        California Code of Regulations, Title 15 ("Title 15"), and/or National
13          Commission on Correctional Health Care ("NCCHC") standards set
        the standard of care to be applied in this case, or that Defendant Nurse
14          Debra Finley violated any of the foregoing policies, regulations, or
        standards.  This motion includes any opinion testimony from
15          Plaintiff's retained nursing expert, Rebecca Luethy, regarding
        Defendant Finley's alleged violations of internal policies, Title 15,
16          and/or NCCHC standards.

17

18

19      Plaintiff and Plaintiff's counsel, and through them, each and every one of

20  their witnesses, should be instructed not to mention, refer to, interrogate concerning,

21  or attempt to convey to the jury in any manner, either directly or indirectly, any of

22  the facts hereinafter mentioned, without first obtaining permission of the Court

23  outside the presence and hearing of the jury; not to make any reference to the fact

24  that this Motion has been filed, and/or granted; and, to warn and caution each and

25  every one of the Plaintiffs' witnesses to strictly follow the same instructions.

26  / / /

27  _____
                                    **1**
28  **DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO
EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION
REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15
REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE
SAME AS STANDARD OF CARE**

## DEFENDANT'S MOTION IS MADE ON EACH OF THE FOLLOWING GROUNDS:

This Motion is made on the grounds that internal departmental or agency policies and manuals, Title 15 regulations, and NCCHC standards do not form the basis for the applicable standard of care, and alleged "violation" of same cannot serve as the basis for civil rights liability in this case.  See, e.g., Gordon v. County of Orange, 2019 WL 4279036, at *8 (C.D. Cal. 2019) ("'[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.' *Davis v. Scherer*, 468 U.S. 183, 194 (1984). The 'focus' is whether the officials would have known their conduct violated federal constitutional rights, 'rather than merely a state law or policy provision.' *Case v. Kitsap Cty. Sheriff's Dep't*, 249 F.3d 921, 929–30 (9th Cir. 2001)."); Gordon v. County of Orange, 2016 WL 11502908, at *7 (C.D. Cal. 2016) ("But even assuming that the acts of the guards violated Jail policy and Title 15, those violations do not themselves establish a constitutional violation.") (citing King v. L.A. County Sheriff's Dep't, 2013 U.S. Dist. LEXIS 185955, *16-17 (C.D. Cal. 2013)); Pezant v. Gonzalez, 2012 WL 126705, *4 (E.D. Cal. 2012) ("[There is no] liability under § 1983 for violating prison policy."); Cousins v. Lockyer, 568 F.3d 1063, (9th Cir. 2009) ("[S]tate departmental regulations do not establish a *constitutional* violation.") (emphasis original); Cotton v. Cty. of Santa Barbara, 2010 WL 11508619, at *2 (C.D. Cal. 2010), aff'd sub nom., Cotton v. Martinez, 475 F. App'x 207 (9th Cir. 2012) ("[V]iolations of internal policies do not necessarily give rise to constitutional violations…. Indeed, internal policies often protect more than the constitutional minimum."); see also, King, supra, 2013 U.S. Dist. LEXIS 185955, *16-17 ("There is no independent cause of action for a violation of Title 15 regulations. To the extent that the violation of a state law amounts to the deprivation

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1  of a state-created interest that reaches beyond that guaranteed by the federal

2  Constitution, [s]ection 1983 offers no redress.") (internal citations omitted) (citing

3  Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) and Lovell v.

4  Poway Unified Sch. Dist., 90 F.3d 367, 370 (9th Cir. 1996)); accord Gardner v.

5  Howard, 109 F.3d 427, 430 (8th Cir. 1997) ("[T]here is no § 1983 liability for

6  violating prison policy.  [Plaintiff] must prove that [the official] violated his

7  constitutional right…").

8      Plaintiff's experts, including Rebecca Luethy, should also be barred from

9  offering opinion testimony concluding, or even suggesting, that a failure to adhere to

10  internal policies or national standards is tantamount to a constitutional violation.

11  See, e.g., Garcia v. County of Riverside, 2019 WL 4282903, at *14 (C.D. Cal. 2019)

12  ("[The expert] cannot state that a failure to comply with professional standards is a

13  violation of federal law, because this is a statement of legal conclusion **and because**

14  **this is an incorrect statement of the law.**") (emphasis added); Estate of Naharro v.

15  Cty. of Santa Clara, 2016 WL 6248957, at *10 (N.D. Cal. 2016) ("An officer's

16  failure to conform to professional standards is **insufficient** to render her liable under

17  the Fourth Amendment.") (emphasis added); Graves v. Arpaio, 2008 WL 4699770,

18  at *25 (D. Ariz. 2008) ("Although the NCCHC standards may be helpful for a jail,

19  the Court makes its findings based on the Eighth and Fourteenth Amendments of the

20  United States Constitution.").

21      Use of internal policies, Title 15 regulations, or NCCHC standards to

22  influence the jury's understanding of the appropriate legal standard to be applied in

23  this case, and any evidence or argument suggesting, or even outright stating, that

24  Defendant Finley "violated" policy, Title 15, or NCCHC standards and should

25  therefore be found liable, would be highly improper and prejudicial to Defendant,

26  even if the Court were to sustain an objection and instruct the jury to disregard the

27
28

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1    matters and not to consider such facts for any purpose.  These matters are therefore

2    excludable under <u>Fed. Rs. Evid.</u> 402 and 403 and the governing law cited above and

3    below.  There is no viable alternative manner in which the evidentiary issues

4    discussed herein can be properly handled at the trial of the case.  Any attempt to

5    bring these matters out before the jury may cause a mistrial, and resulting undue

6    expense and inconvenience of the litigants, the Court, and the public at large.

7           Defendant's Motion is based upon this Notice, the accompanying

8    Memorandum of Points and Authorities, the Declaration of Jesse K. Cox and

9    attached exhibits, the papers and records on files herein, and upon such further oral

10   and documentary evidence as may properly come before the Court.

11          This motion is made following the conference of counsel pursuant to <u>Local</u>

12   <u>Rule</u> 7-3, which took place on April 18, 2022.

13   DATED:  April 25, 2022              **LYNBERG & WATKINS**

14

15

16                          By: _____
                            **S. FRANK HARRELL**
17                          **JESSE K. COX**
                            **MARLENA R. MLYNARSKA**
18                          Attorneys for Defendant
                            DEBRA FINLEY

19

20

21

22

23

24

25

26

27                                    **4**
_____
28   **DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO
     EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION
     REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15
     REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE
     SAME AS STANDARD OF CARE**

1

# <u>TABLE OF CONTENTS</u>

2
3

I.      PRELIMINARY STATEMENT ......................................................................... 1

II.     EVIDENCE OF HCA OR CHS POLICIES, TITLE 15
        REGULATIONS, AND NCCHC STANDARDS AS SETTING THE
        STANDARD OF CARE IS IRRELEVANT, UNFAIRLY
        CONFUSING, AND PREJUDICIAL ................................................................. 5

III.    THE COURT SHOULD EXCLUDE ANY EXPERT OPINIONS
        BASED ON ALLEGED VIOLATIONS OF INTERNAL POLICY,
        TITLE 15 REGULATIONS, OR NCCHC STANDARDS ............................ 10

IV.     CONCLUSION ............................................................................................. 13

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO
EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION
REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15
REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE
SAME AS STANDARD OF CARE**

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

4

**Cases**

5

Backlund v. Barnhart,
  778 F.2d 1386 (9th Cir. 1985)....................................................4, 7, 8, 13

6

7

Baker v. McCollan,
  443 U.S. 137 (1979) ..........................................................................5

8

9

Case v. Kitsap Cty. Sheriff's Dep't,
  249 F.3d 921 (9th Cir. 2001)..........................................................2, 6, 8

10

Cole v. Bone,
  993 F.2d 1328 (8th Cir. 1993)..............................................................8

11

12

Cotton v. Cty. of Santa Barbara,
  2010 WL 11508619 (C.D. Cal. 2010)....................................................2, 6

13

14

Cousins v. Lockyer,
  568 F.3d 1063, (9th Cir. 2009)............................................................2, 6

15

16

Davis v. Scherer,
  468 U.S. 183 (1984) ......................................................................2, 6, 7

17

18

Doe v. Connecticut Dept of Child & Youth Services,
  911 F.2d 868 (2nd Cir. 1990)................................................................9

19

20

Estate of Naharro v. Cty. of Santa Clara,
  2016 WL 6248957 (N.D. Cal. 2016)....................................................3, 12

21

22

Gagne v. City of Galveston,
  805 F.2d 558 (5th Cir. 1986)..............................................................7, 8

23

24

Garcia v. County of Riverside,
  2019 WL 4282903 (C.D. Cal. 2019)....................................................3, 12

25

26

Gardner v. Howard,
  109 F.3d 427 (8th Cir. 1997)............................................................3, 8, 9

27

**2**

28

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO
EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION
REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15
REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE
SAME AS STANDARD OF CARE**

Godinez v. Huerta,
    2018 WL 2018048 ...................................................................................... 12

Gordon v. County of Orange,
    888 F.3d 1118 (9th Cir. 2018) ...................................................................... 5

Gordon v. County of Orange,
    2016 WL 11502908 (C.D. Cal. 2016) ................................................ 2, 1, 4, 6

Gordon v. County of Orange,
    2019 WL 4279036 (C.D. Cal. 2019) ......................................................... 2, 6

Gordon v. Cty. of Orange,
    6 F.4th 961 (9th Cir. 2021) ....................................................................... 1, 5

Graves v. Arpaio,
    2008 WL 4699770 (D. Ariz. 2008) ...................................................... 3, 4, 12

Herring v. Keenan,
    218 F.3d 1171 (10th Cir.2000) ..................................................................... 8

Lovell v. Poway Unified Sch. Dist.,
    90 F.3d 367 (9th Cir. 1996) ...................................................................... 3, 9

Nesby v. City of Oakland,
    2007 WL 831765 (N.D. Cal. 2007) ............................................................. 6

Pezant v. Gonzalez,
    2012 WL 126705 (E.D. Cal. 2012) ........................................................... 2, 6

Smith v. Freland,
    954 F.2d 343 (6th Cir.1992) ................................................................... 8, 13

Sweaney v. Ada County, Idaho,
    119 F.3d 1385 (9th Cir. 1997) .................................................................. 3, 9

United States v. Hanigan,
    681 F.2d 1127 (9th Cir. 1982) ..................................................................... 5

United States v. Hankey,
    203 F.3d 1160 (9th Cir. 2000) ................................................................... 12

**3**

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO
EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION
REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15
REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE
SAME AS STANDARD OF CARE**

Whren v. United States,
    517 U.S. 806 (1996) ................................................................................. 6

Wilson v. Meeks,
    52 F.3d 1547 (10th Cir. 1995) ................................................................. 7

**Statutes**

42 U.S.C. § 1983 ................................................................................... passim

**Rules**

Fed. R. Evid. 402, 403 ........................................................................... 5, 9

-

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO
EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION
REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15
REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE
SAME AS STANDARD OF CARE**

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

As the Court is aware, this matter arises from Decedent Matthew Gordon's incarceration in the Orange County Jail on heroin trafficking charges.  According to the investigating coroner, Gordon ultimately expired in the jail based on the poisonous effects of his long-term heroin abuse on his own heart.

All of Plaintiff Mary Gordon's ("Plaintiff") state law claims were defensed by summary judgment at the first hearing of this matter.  See, Gordon v. Cty. of Orange, 2016 WL 11502908, at *8 (C.D. Cal. 2016).  Almost all of Plaintiff's federal claims were defensed in the second round of summary judgment briefing in this case.  See, Gordon v. Cty. of Orange, 6 F.4th 961, 965 (9th Cir. 2021) ("Based upon a de novo review. . . we affirm" this Court's summary judgment ruling "as to plaintiff's Monell claim and individual defendants Deputy Robert Denney, Nurse Brianne Garcia, and Sergeant Brian Tunque.").  Only one claim advanced in Plaintiff's original case remains – i.e., her Section 1983 claim for allegedly "inadequate medical care" against perhaps the least involved of all the original Defendants in this case, Nurse Debra Finley.

Nurse Finley had only one contact with Gordon during his initial medical screening on September 8, 2013.  At that time, Gordon advised her that he did not have any medical problems, including any heart problems.  He further advised of his self-assessed "3-grams-a-day" heroin habit.  Nurse Finley recorded the absence of any heart issues and Gordon's reported drug intake on his screening form.  She also took Gordon's vital signs, and asked him questions pertaining to his potential withdrawal.  Based on Gordon's responses, his appearance, and his vital signs, it appeared to Nurse Finley that Gordon was experiencing little to no withdrawal symptoms at the time he was screened.  Accordingly, Nurse Finley recommended

**1**

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1    that Gordon be housed in regular housing.

2    Understanding that drug detoxification is a complex medical issue, Nurse

3    Finley referred Gordon to doctor-level care.  Gordon thereafter received medical

4    treatment for his heroin addiction from non-party Dr. Thomas Le.  The final

5    decision on Gordon's housing was also to be made by Dr. Le.  Nurse Finley was not

6    assigned to have any further contact with Gordon after she assessed him at triage

7    and referred him to Dr. Le's care.  Accordingly, Nurse Finley had no further contact

8    with Gordon after she assessed him at triage and referred him to Dr. Le's care.

9    Later on September 8, 2013, Dr. Le was advised of Gordon's history of drug

10    abuse, that Gordonhad an abscess in his leg that needed to be treated," and that

11    Gordon otherwise needed detox treatment.  Dr. Le also determined that Mr. Gordon

12    was a poly-substance abuser, meaning he abused a variety of addictive illicit drugs,

13    including but not limited to heroin.  Specifically, Gordon's urine drug screen test

14    indicated he abused multiple illicit substances and not just opiates.  Accordingly, Dr.

15    Le placed Gordon on a drug withdrawal program, which included detoxification

16    medications to treat Gordon's symptoms.  Specifically, Dr. Le instructed that

17    Gordon was to be medically monitored by administration of the Clinical Institute

18    Withdrawal Assessment for Alcohol ("CIWA") protocol, and by taking of his vital

19    signs.  In Dr. Le's medical judgment, CIWA is a protocol better suited for a poly-

20    substance abuser, like Gordon.  No documentation (or other action or inaction) by

21    Nurse Finley caused Dr. Le to choose the CIWA protocol.  Dr. Le chose the CIWA

22    protocol based on his medical training and experience, and based on all the relevant

23    facts he believed he needed from nursing staff to make his determination.

24    Based upon Gordon's presentation at triage, Dr. Le concluded that Gordon

25    was not experiencing any kind of medical emergency or acute illness that required

26    immediate additional treatment.  For these reasons, Dr. Le did not order that Mr.

27    

28    

**2**

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1 Gordon be placed in either the jail's medical observation unit, or that he be
2 transferred to an outside emergency room facility.

3      On September 9, 2013, at approximately 10:45 p.m., deputies were alerted for
4 the first time that Gordon was in medical distress.  Deputies immediately summoned
5 jail medical staff, and staff responded within minutes.  Despite medical revival
6 efforts by jail medical staff, paramedics, and hospital staff, Gordon expired at
7 Western Medical in Santa Ana.  An autopsy later confirmed that Gordon's death
8 was not preventable.  He had essentially poisoned his own heart through years of
9 heroin abuse—a cause of death known as "acute cardiorespiratory arrest due to
10 chronic substance abuse with hypertrophy and dilation of the heart."  Tellingly,
11 neither the Coroner nor the Orange County District Attorney's Office (who
12 investigated Gordon's death), voiced any criticism of Orange County's jail
13 personnel in their investigation of this matter.

14      Notwithstanding jail deputies' and medical staff's demonstrably
15 commendable efforts to evaluate and treat Gordon following his arrest, Plaintiff
16 filed this lawsuit against multiple individual Orange County Defendants under the
17 federal civil rights provisions of 42 U.S.C. § 1983.  As noted above, Plaintiff's suit
18 has already been largely dismissed.  The case is proceeding to trial on Plaintiff's
19 sole remaining Section 1983 "inadequate medical care" claim on behalf of Decedent
20 and against Nurse Debra Finley.

21      At trial, Defendant anticipates that Plaintiff and her counsel will attempt to
22 introduce evidence of, or otherwise make reference to, internal Orange County
23 Health Care Agency ("HCA") and/or Correctional Health Services ("CHS")
24 policies, California Code of Regulations, Title 15 ("Title 15"), and National
25 Commission on Correctional Health Care ("NCCHC") standards as setting the
26 standard of care Nurse Finley was to meet when evaluating Decedent at the Orange

27

28

**3**

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO
EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION
REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15
REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE
SAME AS STANDARD OF CARE**

County Jail.  Based on her pre-trial presentation Defendant anticipates Plaintiff and her expert(s) will then go a step farther and argue before the jury that Nurse Finley violated these policies, regulations, and/or standards.  (See, Expert Rebecca Luethy Rule 26 Report dated August 31, 2015, Exhibit "4" to Luethy's Deposition taken April 24, 2019, Opinions 2 and 3, pgs. 3-4, Exhibit "A," Declaration of Jesse K. Cox ("Cox Decl."), ¶ 3; see also, "Case Chronology" Prepared by Expert Rebecca Luethy, Exhibit "5" to Luethy's Deposition taken April 24, 2019, pgs. 1-24, Exhibit "B," Cox Decl., ¶ 4; Declaration of Rebecca Luethy In Support of Plaintiff's Opposition to Defendant Debra Finley's Motion for Summary Judgment, Dkt. 189-1, ¶¶ 9, 11, 12, 13, 14, 15, 16, 19, 26, Exhibit "C," Cox Decl., ¶ 5).

But any such attempt would misstate the true standard which governs resolution of this case.  Plaintiff's federal claim under 42 U.S.C. § 1983 requires that Plaintiff prove a violation of the federal Constitution.  A showing that a public employee violated an internal municipal policy or national professional standard of some type is irrelevant.  See, e.g., Backlund v. Barnhart, 778 F.2d 1386, 1390, n.5 (9th Cir. 1985) (dismissing plaintiffs' § 1983 claim because they "failed to show a violation of any constitutional right," despite violation of internal policy); Gordon v. County of Orange, 2016 WL 11502908, at *7 (C.D. Cal. 2016) ("But even assuming that the acts of the guards violated Jail policy and Title 15, those violations do not themselves establish a constitutional violation."); Graves v. Arpaio, 2008 WL 4699770, at *25 (D. Ariz. 2008) ("Although the NCCHC standards may be helpful for a jail, the Court makes its findings based on the Eighth and Fourteenth Amendments of the United States Constitution.").

Plaintiff's attempt to confuse the jury with "standards" which are not the law should be stopped before it starts.  Because evidence of departmental policies, state regulation, or professional guidelines do not set the standard of care for liability, this

4

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1  Court should exclude any evidence attempting to frame same as the legal standard,

2  and preclude evidence of alleged "violations" of same as irrelevant and unfairly

3  prejudicial.  See, Fed. R. Evid. 402, 403.

## II.   EVIDENCE OF HCA OR CHS POLICIES, TITLE 15 REGULATIONS, AND NCCHC STANDARDS AS SETTING THE STANDARD OF CARE IS IRRELEVANT, UNFAIRLY CONFUSING, AND PREJUDICIAL

8      It goes without saying that "[e]vidence which is not relevant is not

9  admissible." United States v. Hanigan, 681 F.2d 1127, 1131 (9th Cir. 1982)

10  (quoting Fed. R. Evid. 402).  Here, the content of internal municipal policies and

11  other extra-judicial guidelines has been repeatedly found irrelevant to the issue of

12  whether a civil plaintiff is entitled to recovery under 42 U.S.C. § 1983 against a

13  governmental defendant.  These rulings have come with good reason.

14      At the outset, the United States Supreme Court has found that the

15  requirements of federal constitutional law—not state or local rules—set the standard

16  for liability under 42 U.S.C. § 1983.  See, Baker v. McCollan, 443 U.S. 137, 146

17  (1979) ("Section 1983 imposes liability for violations of rights protected by the

18  Constitution…").  And the Constitutional standard of care that governs this case is

19  set forth in the Ninth Circuit Manual of Model Jury Instructions, which is informed

20  by rulings from this very case.  See, Ninth Circuit Model Civil Jury Instruction 9.30,

21  "Particular Rights—Fourteenth Amendment—Pretrial Detainees Claim Re

22  Conditions of Confinement/Medical Care (citing Gordon v. County of Orange, 888

23  F.3d 1118, 1124-1125 (9th Cir. 2018) and Gordon v. County of Orange, 6 F.4th 961

24  (9th Cir. 2021)).  It is based exclusively on Constitutional law, not on internal

25  municipal policies or professional standards that may deviate from the requirements

26  of Constitutional law.  Many courts, including this one, have recognized and applied

**5**

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

this important distinction.  See, e.g., Gordon v. County of Orange, 2019 WL 4279036, at *8 (C.D. Cal. 2019) ("'[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.' *Davis v. Scherer*, 468 U.S. 183, 194 (1984). The 'focus' is whether the officials would have known their conduct violated federal constitutional rights, 'rather than merely a state law or policy provision.' *Case v. Kitsap Cty. Sheriff's Dep't*, 249 F.3d 921, 929–30 (9th Cir. 2001)."); Gordon, supra, 2016 WL 11502908, at *7 ("But even assuming that the acts of the guards violated Jail policy and Title 15, those violations do not themselves establish a constitutional violation.") (citing King v. L.A. County Sheriff's Dep't, 2013 U.S. Dist. LEXIS 185955, *16-17 (C.D. Cal. 2013)); Pezant v. Gonzalez, 2012 WL 126705, *4 (E.D. Cal. 2012) ("[There is no] liability under § 1983 for violating prison policy."); Cousins v. Lockyer, 568 F.3d 1063, (9th Cir. 2009) ("[S]tate departmental regulations do not establish a *constitutional* violation.") (emphasis original); Cotton v. Cty. of Santa Barbara, 2010 WL 11508619, at *2 (C.D. Cal. 2010), aff'd sub nom., Cotton v. Martinez, 475 F. App'x 207 (9th Cir. 2012) ("[V]iolations of internal policies do not necessarily give rise to constitutional violations…. Indeed, internal policies often protect more than the constitutional minimum."); Nesby v. City of Oakland, 2007 WL 831765, at *21 (N.D. Cal. 2007) ("The city's internal policy clearly sets a higher standard than is required under the Constitution. Therefore, Nesby cannot establish liability against the city under a [deliberate indifference theory]."); Whren v. United States, 517 U.S. 806, 815 (1996) (state and local "police department practices…vary from place to place and from time to time. We cannot accept that the…seizure protections of the Fourth Amendment are so variable, and can be made to turn upon such trivialities.") (citations omitted).

Even so, the pre-trial phase has confirmed Plaintiff seeks to introduce HCA

**6**

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

and CHS internal policies, Title 15 regulations, and NCCHC standards as a platform for arguing that these extra-judicial sources of information somehow set the standard of care that Defendant's actions violated, and for which the jury should hold Defendant liable.  (See, Expert Rebecca Luethy Rule 26 Report dated August 31, 2015, Exhibit "4" to Luethy's Deposition taken April 24, 2019, Opinions 2 and 3, pgs. 3-4, Exhibit "A," Declaration of Jesse K. Cox ("Cox Decl."), ¶ 3; see also, "Case Chronology" Prepared by Expert Rebecca Luethy, Exhibit "5" to Luethy's Deposition taken April 24, 2019, pgs. 1-24, Exhibit "B," Cox Decl., ¶ 4; Declaration of Rebecca Luethy In Support of Plaintiff's Opposition to Defendant Debra Finley's Motion for Summary Judgment, Dkt. 189-1, ¶¶ 9, 11, 12, 13, 14, 15, 16, 19, 26, Exhibit "C," Cox Decl., ¶ 5).

As noted above, however, inquiry into whether a peace officer violated an administrative, state, or local policy are patently irrelevant to resolution of Section 1983 litigation.  The Ninth Circuit joins all other circuits in reaching this conclusion:

> Whether the deputies violated a state law or an internal departmental policy is not the focus of our inquiry.  See Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995) (finding qualified immunity; "[V]iolation of a police departmental regulation is insufficient for liability under section 1983."); Gagne v. City of Galveston, 805 F.2d 558, 560 (5th Cir. 1986) ("[A]llegations about the breach of a statute or regulation are simply irrelevant to the question of an official's eligibility for qualified immunity in a suit over the deprivation of a constitutional right."); Backlund v. Barnhart, 778 F.2d 1386, 1390 n.5 (9th Cir. 1985) (concluding that any state violation of its own policy is "irrelevant"  to the question of whether state officials are entitled to qualified immunity).

> Rather, our focus is on whether a reasonable officer would have known that the deputies' conduct violated [the plaintiff's] federal statutory or constitutional rights rather than merely a state law or policy provision.  Davis v. Scherer, 468 U.S. 183, 194 & n.12 (1984)

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision," unless the statute or regulation gives rise to the cause of action brought); <u>see also</u>, <u>Herring v. Keenan</u>, 218 F.3d 1171, 1180 (10th Cir.2000) (finding qualified immunity; "[W]ithout a stronger indication ... that a reasonable ... officer ... would have known that she was violating ... constitutional rights ... rather than simply violating an internal policy, we cannot say that [the officer] violated [the plaintiff's] clearly established constitutional right...."); <u>Gardner v. Howard</u>, 109 F.3d 427, 430 (8th Cir. 1997) (finding qualified immunity; "There is no § 1983 liability for violating prison policy. [Plaintiff] must prove that [the official] violated his constitutional right ...."); <u>Gagne</u>, 805 F.2d at 560 (whether an official is entitled to qualified immunity "must be answered solely by an inquiry into whether the constitutional right at issue was clearly established at the time of the events in question"); <u>Backlund</u>, 778 F.2d at 1390 (dismissing plaintiffs' § 1983 claim because they "failed to show a violation of any constitutional right" despite violation of internal policy).

<u>Case v. Kitsap County Sheriff's Dep't</u>, 249 F.3d 921, 929-930 (9th Cir. 2001).

Thus, government agencies are free to hold officials to higher standards than the Constitution requires, without concern that those policies might be used against them in Section 1983 litigation.  <u>See</u>, <u>Smith v. Freland</u>, 954 F.2d 343, 347-348 (6th Cir.1992) ("Under Section 1983, the issue is whether Officer Schulz violated the Constitution, not whether he should be disciplined by the local police force.  A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under Section 1983.").  The point has been made over and over again.  <u>See, e.g.</u>, <u>Cole v. Bone</u>, 993 F.2d 1328, 1334 (8th Cir. 1993) ("We need not determine whether Trooper Rice violated Missouri Highway Patrol Policy, however, for under Section 1983 the issue is whether the government official violated the constitution or Federal law, not

<hr>

**8**

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1  whether he violated the policies for a state agency."); <u>Doe v. Connecticut Dept of</u>

2  <u>Child & Youth Services</u>, 911 F.2d 868, 869 (2nd Cir. 1990) ("A violation of state

3  law neither gives Plaintiffs a Section 1983 claim nor deprives Defendants of the

4  defense of qualified immunity…") (internal citation omitted).

5      Needless to say, Plaintiff's announced trial strategy runs afoul of the

6  foregoing principles.  The defense has no quarrel with a vigorous discussion of what

7  the Constitution required of Nurse Finley under the facts of this case.  But Plaintiff's

8  proposed off-point discussion of HCA or CHS internal policies, Title 15 regulations,

9  and NCCHC standards has no place in this civil rights trial.  <u>See</u>, <u>Gardner v.</u>

10  <u>Howard</u>, 109 F.3d 427, 430 (8th Cir. 1997) ("[T]here is no § 1983 liability for

11  violating prison policy.  [Plaintiff] must prove that [the official] violated his

12  constitutional right…"); <u>King</u>, <u>supra</u>, 2013 U.S. Dist. LEXIS 185955, *16-17

13  ("There is no independent cause of action for a violation of Title 15 regulations. To

14  the extent that the violation of a state law amounts to the deprivation of a state-

15  created interest that reaches beyond that guaranteed by the federal Constitution,

16  [s]ection 1983 offers no redress.") (internal citations omitted) (citing <u>Sweaney v.</u>

17  <u>Ada County, Idaho</u>, 119 F.3d 1385, 1391 (9th Cir. 1997) and <u>Lovell v. Poway</u>

18  <u>Unified Sch. Dist.</u>, 90 F.3d 367, 370 (9th Cir. 1996)).

19      Accordingly, to prevent unfair confusion of issues and attendant waste of

20  time, the Court should exclude Plaintiff's planned critique of Nurse Finely based on

21  internal agency policy, Title 15 regulations, or NCCHC standards.  <u>See</u>, <u>Fed. R.</u>

22  <u>Evid.</u> 402, 403.

23  / / /

24  / / /

25  / /

26  / / /

27  **9**

<u>**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO**</u>
28  **EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION**
**REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15**
**REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE**
**SAME AS STANDARD OF CARE**

## III.     <u>THE COURT SHOULD EXCLUDE ANY EXPERT OPINIONS BASED ON ALLEGED VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, OR NCCHC STANDARDS</u>

Plaintiff has designated Rebecca Luethy as a purported "nursing practices" expert. Ms. Luethy has submitted a Rule 26 report containing her "opinions"; has prepared a "Case Chronology" that includes her notes and conclusions concerning specific action taken by Nurse Finley (including alleged policy "violations"); and has, most recently, submitted a lengthy Declaration in support of Plaintiff's opposition to Nurse Finley Motion for Summary Judgment. From these materials, it is evident that Ms. Luethy intends to offer numerous policy-based "opinions" that must be excluded. It started with her expert report:

- ❖ "[Decedent] was denied prompt care for his serious medical needs, and Nurse Finley disregarded and ignored [Decedent's] need to be seen by a provider/physician by failing to place [Decedent] on the Dr.'s Sick list for 9/9/13, and disregarded and ignored Orange County Health Care Agency Correctional Medical Services (OCHCA) Policy #1320 entitled *Clinic Care*…."

- ❖ "Nurse Finley also disregarded and ignored the danger of severe withdrawal by disregarding and ignoring OCHCA Policy # 1322 entitled *Individual Treatment Plan*…."

- ❖ Nurse Finley "deliberately disregarded the risk to [Decedent's] health and safety by: (b) not assuring additional monitoring of [Decedent] by nursing staff, which is a failure to adhere to OCHCA Policy #1320 and by (c) failing to advise correctional staff of [Decedent's] special health care needs, again failing to adhere to OCHCA Policy #1322."

(<u>See</u>, Expert Rebecca Luethy Rule 26 Report dated August 31, 2015, Exhibit "4" to Luethy's Deposition taken April 24, 2019, Opinions 2 and 3, pgs. 3-4, Exhibit "A," Cox Decl., ¶ 3).

---

**10**

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

Ms. Luethy then doubled-down on her approach in her October 2021 Declaration submitted with Plaintiff's Opposition to Nurse Finley's Motion for Summary Judgment.  (See, Declaration of Rebecca Luethy In Support of Plaintiff's Opposition to Defendant Debra Finley's Motion for Summary Judgment, Dkt. 189-1, ¶¶ 9, 11, 12, 13, 14, 15, 16, 19, 26, Exhibit "C," Cox Decl., ¶ 5).  Several Declaration "opinions" track those from her August 2015 report; others are new. For example:

❖ "The National Commission on Correctional Health Care recommends: "All inmates who screen positive should be formally assessed for opioid withdrawal within 24 hours" (NCCHC Guidelines 2013). Nurse Finley failed to follow this recommendation by choosing CIWA, or blindly acquiescing to Dr. Le's orders and going through the CIWA protocol instead of the COWS protocol, despite knowing that Mr. Gordon was going through opiate withdrawals. Therefore, Nurse Finley never formally assessed Mr. Gordon for opiate withdrawal, as she used the incorrect screening form for alcohol withdrawal instead of the correct screening form for opiate withdrawal--thus violating the 2013 NCCHC Guidelines."

❖ "Defendant Finley indicated that based on her assessment of Mr. Gordon, she noticed a few acute withdrawal symptoms, which were indicated on her assessment ratings (Finley Depo 121:19-25). Detoxification and Treatment Policy # 156 also states "Those inmates assessed by the MD/NP who are exhibiting signs of acute withdrawal will be a medical expedite to the Infirmary." However, despite Mr. Gordon's signs of acute withdrawal, Nurse Finley never instituted a medical expedite to the infirmary."

(See, Declaration of Rebecca Luethy In Support of Plaintiff's Opposition to Defendant Debra Finley's Motion for Summary Judgment, Dkt. 189-1, ¶¶ 11, 15 Exhibit "C," Cox Decl., ¶ 5).

Any attempt by Plaintiff to claim that Ms. Luethy's "opinions" concerning

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1  Defendant's "violations" of internal policy or professional standards are permissible

2  must be rejected.  See, Garcia v. County of Riverside, 2019 WL 4282903, at *14

3  (C.D. Cal. 2019) ("[The expert] cannot state that a failure to comply with

4  professional standards is a violation of federal law, because this is a statement of

5  legal conclusion *and because this is an incorrect statement of the law.*") (emphasis

6  added); Estate of Naharro v. Cty. of Santa Clara, 2016 WL 6248957, at *10 (N.D.

7  Cal. 2016) ("An officer's failure to conform to professional standards is *insufficient*

8  to render her liable under the Fourth Amendment.") (emphasis added); Graves v.

9  Arpaio, 2008 WL 4699770, at *25 (D. Ariz. 2008) ("Although the NCCHC

10  standards may be helpful for a jail, the Court makes its findings based on the Eighth

11  and Fourteenth Amendments of the United States Constitution."); accord Godinez v.

12  Huerta, 2018 WL 2018048, at *6 n. 2 (S.D. Cal. 2018) ("Plaintiff contends that what

13  police policies and training require is 'consistent with the law relating to use of

14  force.' [Citation]. This contention is unavailing.").

15      As this Court is aware, it acts as a "gatekeeper" with respect to the admission

16  of expert testimony.  See, United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir.

17  2000).  As evidenced by the discussion included here, an exercise of this important

18  function is plainly needed now.  Allowing Ms. Luethy to offer opinions on matters

19  our courts have deemed irrelevant in cases like this one can have no effect other

20  than to confuse the jury with standards it will not be asked to apply and adjudge

21  conduct that is not legally actionable in this civil case.  Plaintiff and her expert are

22  free to argue what is expected of jail nurses under the Constitutional principles on

23  which Nurse Finley was trained.  But Plaintiff and her expert are not free to

24  weaponize internal policies and professional standards against Nurse Finley—

25  particularly since these policies set stringent standards of conduct which were

26  enacted on the judicial assurance that they would *not* be unfairly used against their

27  **12**

28  **DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1  employees in court.  See, Backlund, supra, 778 F.2d 1386 at 1390; Smith v. Freland,

2  954 F.2d at 347-348.

3  **IV.    CONCLUSION**

4      The jury in this case will not be presented with a special verdict form asking it

5  to make decisions about whether Defendant violated any internal policy, Title 15

6  Regulations, or NCCHC standards.  Nor will it be instructed to evaluate the

7  Defendant's actions within any rubric put forth in these items.  The jury should

8  make its decision based on substantive law the instructions given by this Court.

9  Internal policies, Title 15 Regulations, and NCCHC standards do not set the

10  standard of care in this case, nor are they grounds for liability for Plaintiffs' civil

11  rights claim.  They, along with Plaintiff's expert's opinions about and reliance on

12  these matters, should therefore be excluded.

13

14  DATED:  April 25, 2022                    Respectfully submitted,

15                                            **LYNBERG & WATKINS**

16

17

18                            By: _____
                                            **S. FRANK HARRELL**
19                                          **JESSE K. COX**
                                            **MARLENA R. MLYNARSKA**
20                                          Attorneys for Defendant
                                            DEBRA FINLEY

21

22

23

24

25

26

27                                          **13**
                     **DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO**
28                   **EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION**
                     **REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15**
                     **REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE**
                     **SAME AS STANDARD OF CARE**

1    <u>**DECLARATION OF JESSE K. COX**</u>

2    I, Jesse K. Cox, do state and declare as follows:

3    1.    I am an attorney at law duly licensed to practice before all the courts of

4    the State of California, and am a partner in the law firm of Lynberg & Watkins,

5    P.C., attorneys of record for Defendant Debra Finley ("Defendant") in the above-

6    captioned matter.

7    2.    I have personal knowledge of the facts stated herein, except those

8    stated upon information and belief, and as to those matters, I believe them to be true.

9    If called upon to testify to the matters herein, I could and would competently do so.

10   This Declaration is made in support of Defendant's Motion in Limine No. 2 to,

11   presently set for hearing at the parties' Final Pre-Trial Conference on May 23, 2022.

12   3.    Attached hereto as Exhibit "A" is a true and correct copy of Plaintiff's

13   retained expert Rebecca Luethy's Rule 26 report containing her "opinions," dated

14   August 31, 2015, attached as Exhibit "4" to Ms. Luethy's deposition taken on April

15   24, 2019.

16   4.    Attached hereto as Exhibit "B" is a true and correct copy of Plaintiff's

17   retained expert Rebecca Luethy's "Case Chronology" disclosed with Ms. Luethy's

18   Rule 26 report, attached as Exhibit "5" to Ms. Luethy's deposition taken on April

19   24, 2019.

20   5.    Attached hereto as Exhibit "C" is a true and correct copy of the

21   Declaration of Rebecca Luethy In Support of Plaintiff's Opposition to Defendant

22   Debra Finley's Motion for Summary Judgment, Dkt. 189-1, filed on October 25,

23   2021.

24   6.    On April 15, 2022, counsel for the parties engaged in the pre-trial

25   meeting of counsel required by Local Rule 16-2.  Thereafter, on April 18, 2022,

26   counsel for the parties exchanged written correspondences concerning the subject

27   **14**

28   **DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15 REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE SAME AS STANDARD OF CARE**

1 | matter of the parties' respective proposed motions in limine.  Specific to this
2 | Motion, the parties have not reached a stipulation so as to avoid the need for the
3 | Motion.

4 |        I declare under penalty of perjury under the laws of the United States that the
5 | foregoing is true and correct.  Executed this 25th day of April, 2022, at Orange,
6 | California.

8 |                                    By: _____
9 |                                          **JESSE K. COX**
                                           Declarant

**DEFENDANT DEBRA FINLEY'S MOTION IN LIMINE NO. 2 TO
EXCLUDE EVIDENCE, ARGUMENT, OR EXPERT OPINION
REGARDING VIOLATIONS OF INTERNAL POLICY, TITLE 15
REGULATIONS, AND/OR NCCHC STANDARDS, OR ATTEMPTS TO USE
SAME AS STANDARD OF CARE**

# EXHIBIT A

Opinions, Case Chronology, and Clinical Notations

Summary of Medical Records, Depositions, Reports, and other Documents

Prepared by Rebecca E. Luethy, RN, MSN, CNS, CCHP

for Cameron Sehat, Esq.

August 31, 2015

Mary Gordon v. County of Orange et al (Case No.SACV14-01050 CJC)

**EXHIBIT**

Luethy 4

4-24-19 slm

PENGAD 800-631-6989

## Introduction

I was retained by Cameron Sehat, Esq. on behalf of the plaintiff on August 18, 2015 to act as Expert Witness for nursing and healthcare services regarding Mary Gordon v. County of Orange et al (Case No.SACV14-01050 CJC).  Pursuant to the requirements of Rule 26(a)(2), I have carefully reviewed and considered the documents provided to me by Mr. Sehat listed below, and I have formed the opinions based upon my skills, knowledge, and expertise as a corrections nurse, also listed below.  Please know that if there are any additional depositions, investigations, policies, reports, memos, video recordings, photos, or other materials produced in this case, a supplemental report could be needed; therefore I reserve the right to supplement my opinions and/or this report. My curriculum vita has previously been provided to Mr. Sehat and is attached.

The records I reviewed in preparation of this document include:

- Defendants' Initial Disclosures Pursuant to Federal Rule 26 (Medical Chart)
- Defendants' First Supplemental Disclosures Pursuant to Federal Rule 26 (P & Ps)
- Defendants' Third Supplemental Disclosures pursuant to Federal Rule 26 (Nursing Procedures)
- Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Production of Documents Set (Old and new COWS P & Ps)
- Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Admissions, Set One
- Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Production of Documents Set Two (Requests for old P & Ps)
- Deposition of Thomas Le, D.O. (Mr. Sehat's deposition)
- Le Exhibits (Associated with Mr. Sehat's deposition)
- Deposition of Brianne Garcia, LVN (Mr. Sehat's deposition)
- Notice of taking of deposition of Brianna Garcia, LVN Nurse Interview Report from Orange County District Attorney
- Deposition of Brenda Finley, RN (Mr. Sehat's deposition)
- Finley Exhibits (Associated with Mr. Sehat's deposition)
- Deposition of Joseph I. Cohen, M.D.
- Cohen Exhibits (Associated with Mr. Sehat's deposition)
- Deposition of Robert Denney, Deputy Sheriff Vol. I (Mr. Sehat's deposition)
- Deposition of Robert Denney, Deputy Sheriff Vol. II (Mr. Sehat's deposition)
- Denney Exhibits Vol. I (Associated with Mr. Sehat's deposition)
- Denney Exhibits Vol. II (Associated with Mr. Sehat's deposition)
- CD entitled "OCDA 1-402"

## Opinions

My review of the listed materials and documents combined with my thirty years' experience in correctional health care has caused me to form the following opinions regarding the care and treatment of MG, during his time of incarceration at the Orange County Central Men's Jail from 9/8/13-9/9/13.

1.     MG was assessed by RN Finley at approximately 1847 on 9/8/13 who noted tremors, anxiety, and agitation. A call was placed to the on-call physician Dr. Le, D.O., who concurred MG had a clear probability for opiate withdrawal symptoms, which can be fatal. Yet, the orders given by Dr. Le and initiated by RN Finley were for alcohol withdrawal. **The wrong withdrawal assessment tool was initiated.** Use of a Clinical Institute Withdrawal Assessment for Alcohol (CIWA-ar) flow sheet is inappropriate for opiate withdrawal. Had MG been assessed using an appropriate Clinical Opiate Withdrawal Scale (COWS) flow sheet on 9/8, findings would have triggered a need for housing in the Medical Observation Unit (MOU) per County Detoxification and Treatment Policy # 156. Multiple other inmates described MG's worsening withdrawal symptoms on 9/8/13 and 9/9/13. If an appropriate COWS scoring sheet had been used, MG's worsening signs and symptoms of withdrawal would have been recorded and appropriate care could have been provided.

2.     Multiple County policies note a requirement for appropriate thorough and frequent monitoring of inmates with serious medical needs. By placing a patient on withdrawal protocol, both **nursing and provider staff have a duty to evaluate the patient routinely.** Because MG was not evaluated after the initial evaluation in intake when he was placed on a withdrawal regimen, nursing and provider staff chose to ignore the danger of severe withdrawal notwithstanding the potential harm to MG. **There is no evidence of nursing assessment for MG after his initial assessment in intake.** Had routine assessments been properly performed by healthcare staff, and had MG been referred for provider sick call on 9/9/13, he would have been found to be in medical distress hours earlier, and his death would have been avoided by the delivery of prompt medical attention.

MG was denied prompt care for his serious medical needs, and Nurse Finley disregarded and ignored MG's need to be seen by a provider/physician by failing to place MG on the Dr.'s Sick Call list for 9/9/13, and disregarded and ignored Orange County Health Care Agency Correctional Medical Services (OCHCA) Policy #1320 entitled *Clinic Care* which states: "Physicians conduct sick call daily, seven days per week, at the central jail facilities ". In addition, OCJ Policy #310 "*Intake Screening and Triage*" indicates when an Intake Screening and Triage Form is stamped with "Medical", as MG's was, the inmate requires "CHS prescriber evaluation". MG should have been evaluated by a prescriber on 9/9/15.

Nurse Finley also disregarded and ignored the danger of severe withdrawal by disregarding and ignoring OCHCA Policy # 1322 entitled *Individual Treatment Plan* which states: "Security staff shall be informed of components of the treatment plan which are necessary to ensure appropriate care of the inmate", and "Practitioners monitor treatment plan progress, including medications, labs, etc. through chart review and follow-up appointments", and "Housing recommendation will be communicated to security staff and shall consider: Regular housing when medically safe and appropriate, Sheltered Living housing for inmates with medical issues which may pose a risk to themselves or others if placed in regular housing ,Medical Observation unit housing for inmates with medical problems requiring more frequent medical observation, but not requiring hospitalization.

Because neither vital signs nor any other observations were recorded or reported on by the LVNs "Vida, S", or "Baks, R." or B. Garcia, the medication nurses who should have been aware they were administering medications for withdrawal symptoms, it is clear the medication LVNs were deliberately indifferent to MG's serious medical conditions when they had knowledge of a substantial risk of serious harm to inmate health or safety.

3.     Because RN Finley noted opiate withdrawal risk, she performed an initial assessment and contacted Dr. Le for withdrawal orders, and then started MG on withdrawal protocol. This shows RN Finley was:

(1) aware of facts of MG's history and of subjective and objective assessment data from which an inference of opiate withdrawal could be drawn that a substantial risk of harm existed;

3

(2) actually drew the inference by contacting Dr. Le and placing MG on withdrawal protocol;

BUT

(3) nevertheless deliberately disregarded the risk to MG's health and safety by:

 a) not creating a plan of care or individual treatment plan that included assessment of MG by a provider/prescriber on 9-9-13,

b) not assuring additional monitoring of MG by nursing staff, which is a failure to adhere to OCHCA Policy #1320 and by

c) failing to advise correctional staff of MG's special health care needs, again failing to adhere to OCHCA Policy #1322

Detoxification and Treatment Policy # 156 states:  "Detoxification is the medical process for extended treatment for those inmates experiencing withdrawal symptoms from drugs or alcohol. Long-term detoxification must occur in medical or general housing areas, under medical attention and monitoring", "Those inmates assessed by the MD/NP who are exhibiting signs of acute withdrawal will be a medical expedite to the Infirmary", "The MD/NP orders the alcohol (ETOH) or opiate detoxification protocol", and Intake Screening and Triage Policy #310 which states "The Registered Nurse will determine the Triage disposition of the arrestee based on intake screening findings, consulting with a higher medical authority as needed. The disposition options include...'MEDICAL' An inmate requiring a CHS prescriber evaluation". "'EXPEDITE' bookings will be visually observed by CHS clinical staff every two (2) hours to note any deterioration in health status. These checks will be documented on the Classification/Housing Review form."  The 2013 guideline for acute opioid withdrawal promulgated by the National Commission on Correctional Health Care (NCCHC) also focuses on appropriate care and treatment:  "Acute opioid withdrawal is common upon entry into correctional facilities, and, untreated, may result in needless suffering, interruption of life-sustaining medical treatments, and rarely, death."

4

# EXHIBIT B



Case Chronology

Summary of Medical Records, Depositions, Reports, and other Documents

| Date/Time | Event/Care Provider | Source | Event/Description | Luethy Clinical Notations |
|---|---|---|---|---|
| 9-8-13/0700 | Last heroin use reported by MG/A. Martinez. | Placentia Police Department report OCDA000188 | M. G. feared becoming "drug sick" if taken to Orange County Jail. | |
| 9-8-13/1238 | Medical screening at Placentia Police Department/booking officer signature illegible | Placentia Police Department Preliminary Medical Screening Questionnaire OCDA000206-207 | Booking officer indicated MG appeared under the influence of alcohol or other drugs. MG denied other medical history. | |
| 9-8-13/1800 | Transferred from Placentia Police Department to Orange County Jail/Lt. Butts | Orange County District Attorney's Office Bureau of Investigation Interview Report OCDA000224 | Lt. Butts of Placentia Police Department advised MG to express his concern over heroin withdrawal while at the Orange County Jail to the nursing staff upon his arrival there. | |
| 9-8-13/no time indicated on form<br><br>Time was approx. 1838 per Orange County District Attorney's Office Bureau of Investigation report | Intake Screening and Triage/ Booking Officer: J. Hunziker. Intake Nurse: D. Finley RN | Intake Screening and Triage form Page 1 of 2 OCP000028<br><br>Orange County Bureau of Investigation report OCDA000407 | Per Statement of Booking Officer, officer indicates "no" to question regarding arrestee appearing to be under the influence of drugs or alcohol, disoriented, confused, or have impaired level of consciousness, or injured in any way.<br><br>Per Medical/Mental Health Questionnaire: MG denies all medical and mental health conditions, allergies, pain, communicable disease, injury. Denies alcohol use. Admits to 3 gram daily IV heroin use. Denies current methadone use. Denies suicidality. Denies previous booking at Orange County Jail. Reports need for/use of soft contact lenses.<br><br>Booking officer notes MG is acceptable for | Top of page bears what appears to be a fax stamp: From: (blank) 09/23/2014 09:58 #572 P. 005/055.<br><br>OCHCA Policies and Procedures (Bate stamp nos. OCP000113–OCP000132) (Exhibit "A") Policy No. 310 effective 4-24-12 "Intake Screening and Triage" includes directions on screening and disposition of inmate patient. Standards of sound nursing practice may have been violated, as although MG admitted to daily 3 Gm. IV heroin use, and his skin condition revealed numerous scars and at least one abscess, **RN Finley _did not_ recommend** him for housing on the Medical Observation Unit (MOU). |

| | | |
|---|---|---|
| booking and transfer to Theo Lacy. Notes MG should not be placed on work status until follow-up or re-check on 9-15-13. | | **Prudent nursing practice would require RN Finely to place MG on the Dr.'s Sick Call List for Monday, September 9, 2015, since he had been prescribed withdrawal medications by a provider, yet he had not been assessed by a provider on 9/8/15.** |
| | | There is no evidence that MG's name on a Provider Sick Call List. |
| | | RN Finley was aware of the high probability of MGs withdrawal symptoms increasing, yet did not place MG on the Dr.'s Sick Call List for Monday morning. |
| | | While nurse Finley did obtain a telephone order from Dr. Le, the on-call physician, there is no evidence of additional patient assessment while he was in booking or The Loop prior to his placement in Mod. C., even though there is evidence of MG complaining of withdrawal symptoms while in The Loop. One inmate in The Loop reports MG experienced vomiting and dry heaves. In fact, only one set of vital signs and a cursory assessment is noted in the medical record throughout MG's incarceration. |
| | | **MG was assessed by RN Finely and confirmed by Dr. Le as having a clear probability for opiate withdrawal symptoms, which can be fatal. By placing a patient on a withdrawal** |

| Date | Source | Document | Per Nurse Observations | Comments |
|---|---|---|---|---|
| 9-8-13/no time Indicated | Intake Screening and Triage/ Booking Officer: J. Hunziker. Intake Nurse: D. Finley, RN | Intake Screening and Triage form Page 2 of 2 OCP000029 | Per Nurse Observations: MG shows no signs of withdrawal, and is alert and oriented x 4. RN notes dried healing scabbed abscess to inner right leg, approximately ½ cm.<br><br>T 97.4, P68, RR 18, BP 129/82, SPO2 100%.<br><br>No mental health assessment performed (to be completed by MH when indicated). | protocol, both nursing and provider staff have a duty to evaluate the patient routinely.<br><br>Because MG was not evaluated, nursing and provider staff chose to ignore the danger of severe withdrawal notwithstanding the potential harm to MG.<br><br>The National Commission on Correctional Health Care recommends: " All inmates who screen positive should be formally assessed for opioid withdrawal within 24 hours" (NCCHC Guidelines 2013)<br><br>Orange County Correctional Medical Services Standardized Procedures for Registered Nurses, Section 4.B "Abscess" OCP000255-OCP0000257<br><br>RN's assessment and plan of care for MG's abscess more likely than not did not meet standard of care as described in procedure 4.B "Abscess", as MG was not placed on the Dr.'s Sick Call list to be seen 9/9/13 even though antibiotics for abscess were initiated.<br><br>Top of page bears what appears to be a fax stamp: From: (blank) 09/23/2014 09:59 #572 P. 007/055<br>This is the only set of vital signs recorded during MG's incarceration.<br><br>RN Finley marked "no" on Question 25 (OCP000029) which asked "Are there any signs of alcohol/drug intoxication |

7

and/or withdrawals?" However, on the CIWA form (OCP0000034), she noted tremors, anxiety, and agitation.

Page requires Nurse's signature and name stamp. Nurse has provided signature in both areas: no name stamp used.

Because RN Finley noted opiate withdrawal risk, she performed an initial assessment and contacted Dr. Le for withdrawal orders, and then started MG on withdrawal protocol.

This shows RN Finley was:

(1) aware of facts of MGs history and of subjective and objective assessment data from which an inference of opiate withdrawal could be drawn that a substantial risk of harm existed;

(2) actually drew the inference by contacting Dr. Le and placing MG on withdrawal protocol;

BUT

(3) nevertheless disregarded the risk to MG's health by:

a) not creating a plan of care or individual treatment plan that included assessment of MG by a provider/prescriber on 9-9-13,
b) not assuring additional monitoring of

| Date/Time | Entry | Document | Summary | Analysis |
|---|---|---|---|---|
| 9-8-13/1847 | Intake Screen–Clinic visit/ Debora Finley, RN | Intake Screen (computer generated) OCP000033 | Computer-generated summary of hand-written intake screens (OCP000028 and OCP000029). Identifies 3 Gm.–day heroin use via injection. Identifies use of soft contact lenses. Notes skin lesions observed by nurse. Physical exam notes that patient states skin lesions are acne 9healing abscess to inner right leg approx. ¾ cm in size, no drainage. Vital signs as described on Intake Screen. Administrative: Triage disposition– medical; Work status and transfer status– OK to Theo Lacy only. | MG by nursing staff, which is a failure to adhere to County policy #1320 and by c) failing to advise correctional staff of MG's special health care needs, again failing to adhere to County policy #1322.<br><br>The National Commission on Correctional Health Care (NCCHC-2014) promulgates standards for jails and prisons based upon evidence-based practice and law, and has been recognized as the gold standard for jail and prison health care standards since 1976. The first standard addresses access to care and is found as an Appendix to this document. Entitled "J-A-01: ACCESS TO CARE", it is an essential standard and, among other things, warns against "Having an understaffed, underfunded, or poorly organized system with the result that it is not able to deliver appropriate and timely care for patients' serious health needs." The OCJ appears to be poorly organized, as there was no apparent method to follow MGs health needs from the time he was screened in Intake, traveled to the Iroop, then to Mod C. For this reason, the OCJ –Central Men's Jail does not meet the standard of care for healthcare services in jails and further deliberate indifference was shown to MG's serious medical needs.<br><br>OCJ Policy #310 "Intake Screening and Triage" indicates when an Intake Screening and Triage Form is stamped with "Medical", as MG's was, the inmate |

| 9-8-13/1847 | Initiation of procedure for alcohol withdrawal/D. Finley, RN | Clinical Institute Withdrawal Assessment for Alcohol (CIWA-Ar) form Page 1 of 3 F042 XXX 2/12 OCP000034 | Order for "Reg Nsg CIWA and vital signs every day for four days. Transcribed by J Winters. Ordered by T. Le, MD.

Vital Signs exactly the same as booking vitals: T 97.4, P68, RR 18, BP 129/82, SPO2 100%.

CIWA score 3 (absent or minimal withdrawal) | requires "CHS prescriber evaluation". MIG should have been evaluated by a prescriber on 9/9/15.

A disregard for MIG's health needs caused MIG to not be seen by a prescriber on Monday, 9/9/15.

Top of page bears what appears to be a fax stamp: From: (blank) 09/23/2014 09:59 #572 P. 011/055

CIWA-Al appears to have been initiated in booking.

Unclear why Dr. T. Le ordered CIWA-ar protocol, as this protocol is for alcohol withdrawal. Patients undergoing alcohol withdrawal require different assessment and treatment than do patients withdrawing from other drugs.

Nurse Finley accepted CIWA-ar as a telephone order from Dr. Le.

From Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Production of Documents Set Two, page 6: Request for Production No. 54 requests:

The OCHCA Nursing policies and Procedure regarding inmate heroin withdrawal drug protocols, including but not limited to Clinical Institute Withdrawal Assessment. (CIWA, Clinical Institute Withdrawal Assessment).

Regarding the Response to Request for |

10

| | | | | |
|---|---|---|---|---|
| 9-8-13/1847 | Initiation of procedure for alcohol withdrawal/D. Finley, RN | Clinical Institute Withdrawal Assessment for Alcohol (CIWA-Ar) form Page 3 of 3 F042 Revised 3/13 OCP000035 | Includes directions for medical staff. Includes initials and sig of RN: DF;  Finley RN | Production No. 54, the defense states: Regarding OCHCA Nursing policies and Procedure regarding Clinical Institute Withdrawal Assessment, a diligent search and reasonable inquiry has been made in an effort to locate the items demanded, and Responding party is unable to comply with this request as *no such policy document existed at the time of the incident.*

If no policies existed to address drug withdrawal, then the **Standard of Care requiring appropriate response to the detoxifying/withdrawing detainee was not met.**

In its standard entitled "J-A-05: POLICIES AND PROCEDURES", the NCCHC (Appendix to this document) notes "Each policy and procedure in the health care manual is reviewed at least annually". There is no evidence of existing withdrawal policies or of their annual review.

Top of page bears what appears to be a fax stamp: From: (blank) 09/23/2014 10:00 #572 P. 012/055

In Finley's deposition, she believes the CIWA-ar was the form used to assess withdrawal from alcohol *and* opiates. Also notes the form is no longer in use. P.19, Line 1.

Finley cites very little/no orientation/training on opiate withdrawal |

| Date | Order/Description | Form | Notes | Analysis |
|---|---|---|---|---|
| 9-8-13 | Order for lower bunk for 5 days./CMS 7792 | Miscellaneous Message Slip OCP000032 | Form states "Lower bunk requested due to ___." Instead of reason for lower bunk indicated, "x 5 days" is written in on the blank. | from OC, P. 22.<br><br>In its standard entitled J-C-09: ORIENTATION FOR HEALTH STAFF, NCCHC (Appendix to this document) notes the importance of thorough orientation and training for all healthcare staff. It appears the OCI nurses do not receive thorough orientation and training on withdrawal from alcohol and other drugs.<br><br>MG did not receive a lower bunk. There is no evidence of communication between health care staff and correctional staff regarding MG's health needs when he was transferred to Mod C, except for the attachment of the "Miscellaneous Message Slip" on his housing card that indicted MG should have a lower bunk. A lower bunk was not given. In cases where inmates are withdrawing from alcohol or other drugs, a lower bunk is indicted for safety, for access by medical personnel, and for patient comfort.<br><br>Nurse Finley knew of and disregarded an excessive risk to MG's safety and health by not communicating why MG needed a lower bunk. Corrections staff are aware of jail culture and a pecking order among detainees. Corrections staff received the Low Bunk order from medical but did not adhere to the request. |
| 9-8-13 1900 | Results of urine drug screen/D. Finley, RN | CHS Urine Screen report form | Urine drug screen positive. | No evidence that this information was communicated with the on call physician. |

| | | | | Dr. T. Le. |
|---|---|---|---|---|
| | | No Bates stamp OCDA000065 | | By not reporting results of the urine drug screen to Dr. Le, Nurse Finely knew of and disregarded an excessive risk to MG's health. |
| 9-8-13/2107 | Intake Chest X-Ray | American Correctional Solutions/OCJ Radiology Report OCP000077 | No acute disease demonstrated on intake chest x-ray. | Autopsy found lungs to be heavy and edematous. |
| 9-8-13/2300 | Antibiotic orders/ Verbal Order Dr. T. Le, DO. Transcribed by K. Winters, RN. | County of Orange Health Care Agency Correctional Medical Services Medical Orders form OCP000030 | | Bates stamp OCP000030, written by K. Winters RN shows one nursing documentation error: K. Winters notes Dr. Le as an "MD" in her notes. Dr. Le is a D.O. |
| | | | | In his deposition, Dr. Le states that he has received no job training for his role as physician from the County because he is a "contract worker". P 17, lines 5,6,7. |
| | | | | In its standard entitled J-C-09: ORIENTATION FOR HEALTH STAFF, NCCHC (2014) notes the importance of thorough orientation and training for all healthcare staff. **It appears the OCJ staff do not receive thorough orientation and training.** |
| | | | | In his deposition, Dr. Le states that it is not common practice at OCJ to monitor/evaluate patients for whom antibiotics have been prescribed "because if they get worse, usually the inmate will notify us they are not getting better, and we evaluate them again". P |

| | | | | |
|---|---|---|---|---|
| | Opiate Withdrawal Orders given/Verbal Order from T. Le, DO. Transcribed by K. Winters, RN | Opiate Withdrawal Orders OCP000031<br><br>Detoxification Treatment Orange County Correctional Medical Services Nursing Procedures No. 156 OCP000120<br><br>County of Orange Healthcare Agency Correctional Medical Services Chemically Dependent Inmates | Orders Include:<br>Regular housing/ Lower Bunk, Lower Tier for 5 days<br>No known allergies<br>Nursing Detox Assessments: COWS is **manually crossed off the form as an option for care and instead, (handwritten): CIWA x 4 Days is written in its place.**<br><br>Medications:<br>Tylenol 650 mg by mouth three times a day for five days for fever, pain, chills (okay to refuse)<br><br>Atarax 50 mg 1 tablet by mouth three times a day for 5 days for insomnia/anxiety (okay to refuse)<br><br>Imodium 2 mg four times per day for three | 28, lines 19-24.<br><br>**This statement supports the deliberately indifferent attitude OCI healthcare staff have about their patients and those patients medical conditions.**<br><br>Sound nursing practice would suggest that any nurse (vocational or registered), who administers medications would **always assess for efficacy of medicine being administered as well as for side effects throughout the course of treatment.** To wait for a patient to complain of adverse reactions or to complain of the medication being **ineffective is not the standard for sound nursing practice.** |
| 9-8-13/23:05? 23:35? (illegible) | | | | Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Production of Documents Set, page 3:<br>REQUEST FOR PRODUCTION NO. 59;<br>Requests<br>Any document(s) relating to the Orange County Healthcare Agency Service's Clinical Opiate Withdrawal Symptoms ("COWS") policies and procedures including the actual COWS chart currently in use at the Central Men's Jail.<br><br>RESPONSE TO REQUEST FOR PRODUCTION NO. 51;<br>Defendant responds by providing documents representing the COWS form in use in 2013 (OCP000376-OCP000377), the COWS form currently in use from |

| | | |
|---|---|---|
| No. 1365 OCP000131<br><br>COWS Withdrawal Scale<br>From Finley deposition exhibits<br>No Bates Stamp<br>Annexes 87<br><br>Orange County Correctional Medical Services Standardized Procedures for Registered Nurses 3.C Narcotic Overdose OCP000247-249<br><br>Orange County Correctional Medical Services Standardized Procedures for Registered Nurses 8.G Nausea and Vomiting OCP000336-338 | days for diarrhea and abdominal pain (okay to refuse)<br><br>If vomiting, diarrhea, tremors, fevers, and chills are not relieved by the above treatment, Clonidine ordered. | January 2014 (OCP000378-OCP000380), and the current policy referencing the use of COWS, which did not go into effect until October 2013 (OCP000374-OCP000375).<br><br>The referenced COWS forms which are stated by the defendants to have been in effect in 2013 (OCP000376-OCP000377) were not included in MG's medical record.<br><br>It is more likely that not that the standard of care for Clinical Opiate Withdrawal Symptoms ("COWS") policies and procedures was never followed in MG's case. In fact, an inappropriate form—CIWA-ar—designed for alcohol withdrawal was initiated on 9/8, and even that was never followed on 9/9 on.<br><br>Regarding Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Admissions, Set One, page 10: Request for Admissions No. 22: requests Admit that the County of Orange did not have a policy regarding the administration of Suboxone to prisoners at Men's Central Jail at the time of Matthew Gordon's death.<br><br>Response to Request for Admissions No. 22: Defendant responds as follows: Admit.<br><br>Regarding Defendant County of Orange's |
| | | |

15

Response to Plaintiff Mary Gordon's Request for Admissions, Set One, page 10: Request for Admissions No. 23: requests Defendant admit that MG was never provided heroin withdrawal medication after being admitted to the Men Central Jail on September 8, 2013.

RESPONSE TO REQUEST FOR ADMISSIONS NO. 23:
Defendant responds as follows: Deny.

Regarding Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Admissions, Set One, page 10: Request for Admissions No. 24: requests defendant Admit that decedent MG, was never provided Suboxone nor Methadone after being admitted to the Men's Central Jail on September 8, 2013.

RESPONSE TO REQUEST FOR ADMISSIONS NO. 24:
Admit

Regarding Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Admissions, Set One, page 10: Request for Admissions No. 25: requests defendants admit that the County of Orange did not have a policy regarding the administration of Methadone to inmates at Men's Central Jail at the time of MG's death.

RESPONSE TO REQUEST FOR ADMISSIONS NO. 25:

16

| | | | | Defendant responds as follows: Admit.<br><br>NCCHC standard J-E-02: RECEIVING SCREENING (Appendix attached), identifies drug or alcohol withdrawal as "urgently in need of medical attention."<br><br>NCCHC standard J-G-07: INTOXICATION AND WITHDRAWAL states "Alcohol withdrawal is the abstinence syndrome with the highest mortality rate, although **withdrawal from opiates and depressant drugs (e.g., benzodiazepines) may be, on occasion, life-threatening....Mild to moderate forms of withdrawal can worsen without appropriate treatment, and continued assessment is required.**<br><br>**MG was assessed only once, at approximately 1847 on 9-8-13, and was not assessed again. He expired 28 hours later, without additional nursing assessment, and without seeing a provider during physician's sick call on 9-9-13.**<br><br>**Because MG was neither assessed by a physician or a nurse on 9-9-13, as per Administrative Policy #3320, healthcare staff Finley and Garcia failed to act when they had knowledge of a substantial risk of serious harm to inmate health or safety.**<br><br>Tylenol is an over-the-counter medication and is used or prescribed for fever, aches, and pain. |
|---|---|---|---|---|
| 9-9-13<br>9-10-13 | Medication Administration: Tylenol 235 mg, 2 tablets three times | Medication Administration Record form. OCP000078 | Verbal order by Thomas Le, MD. Shows TID (three times per day) medications are given at noon, in the afternoon, and at bed time. | |

18

| | | |
|---|---|---|
| per day by mouth/ Baks, R., Blac, C., Vida, S., and Garc, B. Start Date: 9-8-13 Stop Date: 9-13-13 | Notes medication was given at noon, in the afternoon, and at bedtime on 9-9-13.<br><br>Notes medication was not given at noon and in the afternoon of 9-10-13 because MG was in court. Notes medication was not given at bedtime on 9-10-13 because MG was not in jail. | In his deposition, Dr. Le states "All these medications are PRN. That means if you want it, you can ask for it. If you don't want it, you can say "no". P 86, line 6.<br><br>Medication nurses should have noted that MG was on medications for withdrawal. **A prudent nurse would be aware of the need for routine vital sign measurement. MG's vital signs were not taken.**<br><br>Because neither vital signs nor any other observations were recorded or reported by the medication nurse who should have been aware she was administering medications for withdrawal symptoms, it is clear there LVN Garcia was deliberately indifferent to MG's medical needs when she had knowledge of a substantial risk of serious harm to inmate health or safety.<br><br>In her deposition, B. Garcia, LVN, states the bedtime medication administration is performed between 7:00 PM and 9:00 PM P.37, line 18.<br><br>In her deposition, B. Garcia, LVN, after having been asked about her responsibility as an LVN to make assessments during medication administration states "We don't make assessments. We will notice things upon interaction, but it's not a recorded assessment."p. 32, lines 9-11. Then, when being asked about her obligations |

to report when relieving RNs for a short period of time in the infirmary, she states: "to report anything, if we see anything – if anything happens, we would report it to the RN." P. 33, lines 15-16.

In her interview with the District Attorney's office, B. Garcia recalls having administered bedtime medications at 8:30 PM. OCDA000112

LVN "Baks,R." notes she did not give MG his medications at noon or in the afternoon of 9-10-15 because MG was "In Court".

Had LVN Baks, R. asked the officer who oversaw medication administration where MG was, it is doubtful the correctional deputy would have told LVN Baks that MG was in court, when he had expired.

LVN Baks, R. assumed MG was in court on 9-10 showing there was deliberate indifference to his medical needs: if MG *was* in court, LVN Baks, R. should have inquired about how to get his medications to him while in court, or at least should have asked the correctional deputy to advise her when MG had returned from court so she could deliver his medications.

It wasn't until the bedtime medication administration rounds performed by

| Date | Medication | Document | Notes | Commentary |
|---|---|---|---|---|
| 9-9-13 9-10-13 | Medication Administration: Ondansetron 4mg, 1 tablet three times per day by mouth/Baks, R, Blac, C., Vida, S, and Garc, B. Start Date: 9-8-13 Stop Date: 9-13-13 | Medication Administration Record form. OCP000079 | Verbal order by Thomas Le, MD. Shows TID (three times per day) medications are given at noon, in the afternoon, and at bed time. Notes medication was given at noon, in the afternoon, and at bedtime on 9-9-13. Notes medication was not given at noon and in the afternoon of 9-10-13 because MG was in court. Notes medication was not given at bedtime on 9-10-13 because MG was not in jail. | LVN "Black, C." that it was indicated in the chart that MG was "Not In Custody". Ondansetron is commonly called Zofran and is prescribed for nausea. |
| 9-9-13 9-10-13 | Medication Administration: Hydroxyzine 50mg, 1 tablet/capsule three times per day by mouth/Baks, R., Blac, C., Vida, S, and Garc, B. Start Date: 9-8-13 Stop Date: 9-13-13 | Medication Administration Record form. OCP000080 | Verbal order by Thomas Le, MD. Shows TID (three times per day) medications are given at noon, in the afternoon, and at bed time. Notes medication was given at noon, in the afternoon, and at bedtime on 9-9-13. Notes medication was not given at noon and in the afternoon of 9-10-13 because MG was in court. Notes medication was not given at bedtime on 9-10-13 because MG was not in jail. | Hydroxyzine is commonly called Atarax and is prescribed for anxiety and restlessness. |
| 9-9-13 9-10-13 | Medication Administration: Loperamide HCl 2mg, 1 capsule four times per day by mouth/Baks, R., Blac, C., Vida, S, and Garc, B. Start Date: 9-8-13 Stop Date: 9-13-13 | Medication Administration Record form. OCP000081 | Verbal order by Thomas Le, MD. Shows QID (four times per day) medications are given in the morning, at noon, in the afternoon, and at bed time. Notes medication was given at noon, in the afternoon, and at bedtime on 9-9-13. Notes medication was not given in the morning of 9-10-13 because MG was not in jail. Medication was not given at noon and in | Loperamide is commonly referred to as Imodium and is used or prescribed for diarrhea. It is an over-the-counter medication. |

21

| | | | | |
|---|---|---|---|---|
| 9-9-13 9-10-13 | Medication Administration: Sulfamethoxa/Trimethoprim DS 800 mg/160 mg, 1 capsule twice per day by mouth/Baks, R., Blac, C., Vida, S, and Garc, B. Start Date: 9-8-13 Stop Date: 9-15-13 | Medication Administration Record form. OCP000082 | the afternoon of 9-10-13 because MG was in court. Notes medication was not given at bedtime on 9-10-13 because MG was not in jail. Verbal order by Thomas Le, MD. Shows BID (two times per day) medications are given at noon and at bed time. Notes medication was given at noon and at bedtime on 9-9-13. Notes medication was not given at noon of 9-10-13 because MG was in court. Notes medication was not given at bedtime on 9-10-13 because MG was not in jail. | Sulfamethoxa/Trimethoprim is commonly referred to as Septra or Bactrim and is used to treat infection. It is available by prescription only. In his deposition, Dr. Le states "All these medications are PRN. That means if you want it, you can ask for it. If you don't want it, you can say "no". P 86, line 6. Antibiotics are never given on an "as-needed" basis. |
| 9-9-13/0826 | Transferred to Modular C, Tank 11, Bunk 48 (upper) | Orange County District Attorney's Office Bureau of Investigation report OCDA000408 | Inmate BIL states MG "very sick" while in the Loop. BIL states male nurse gave MG medication while in the Loop. Inmate RK states MG appeared to be withdrawing from heroin upon transfer to Mod C, although RK did not any unusual signs indicating MG was in medical distress. MG told inmate DJM that he was feeling "dope sick". | NCCHC standard (Appendix attached) "J-A-08: COMMUNICATION ON PATIENTS' HEALTH NEEDS" states "Communication occurs between the facility administration and treating health care professionals regarding inmates' significant health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff." **There is no evidence of communication between health care staff and correctional staff regarding MGs serious health care health needs when he was transferred to Mod C,** except for the attachment of the Miscellaneous Message Slip on his housing card that indicted MG should have a lower bunk. A lower bunk was not given. In cases where inmates are withdrawing from |

22

| Date/Time | Event | Source | Notes |
|---|---|---|---|
| | | | alcohol or other drugs, a lower bunk is indicted for safety, for access by medical personnel, and for patient comfort.<br><br>Common standard of practice as well as County Policy 156 (OCP0000120) *Detoxification and Treatment* is to place a newly-admitted patient for whom withdrawal protocol has been started, In a *medical observation unit*, or MOU, until the prescribing physician or another provider could evaluate him in person at the next physician sick call opportunity.<br><br>Also reference County Policy 1365 (OCP000131) *Chemically Dependent Inmates*. With MG's 3 gm./day level heroin habit, we can conclude that because of his dependency and current poor health status, he should have housed in the Medical Observation Unit or transferred out. |
| 9-9-13/1030 | Inmates from Mod C released for lunch at the mess hall. | Orange County District Attorney's Office Bureau of Investigation report OCDA000409 | Inmate DJM states MG did not leave bunk for lunch and remained on his bunk. |
| 9-9-13/1800 | Inmate count | Orange County District Attorney's Office Bureau of Investigation report OCDA000409 | Inmate DJM states he saw MG standing for count, then a short time later, on the phone within the tank. |
| 9-9-13/2030 | Bedtime medication administration. | Orange County District Attorney's | Inmate PB described MG as "antsy", and resembled someone who was "kicking"<br><br>In her interview with the District Attorney's office, B. Garcia recalls having |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | Office of Bureau of Investigation report OCDA000409-410 | heroin". MG returned to his bunk after receiving medications, according to inmate PB. | administered bedtime medications at 8:30 PM. OCDA000112<br><br>In her deposition, B. Garcia, LVN, states the bedtime medication administration is performed between 7:00 PM and 9:00 PM P.37, line 18.<br><br>Nurse Garcia should have noted that MG was on medications for withdrawal. **A prudent nurse would be aware of the need for routine vital sign measurement.** MG's vital signs were not taken. |
| 9-9-13/2100 | Lights out. | Orange County District Attorney's Office Bureau of Investigation report OCDA000409-410 | Inmate DJM states MG stated he was attempting to arrange bail and that he was "really sick" and needed to get home. |  |
| 9-9-13 |  | Orange County District Attorney's Office Bureau of Investigation report OCDA000409-410 | Multiple inmate witnesses report MG was ill. None alerted correctional staff. | Orange County Correctional Medical Services Standardized Procedures for Registered Nurses, Section 8.G "Nausea and Vomiting" OCP000336-OCP000338<br><br>RN's assessment and plan of care for MG's nausea and vomiting more likely than not did not meet standard of care as described in procedure 8.G "Nausea and Vomiting", as no nurses evaluated MG from the time of intake until "Man Down" was called. |
| 9-9-13/2244 | Placement of AED | HeartStart Case Details Report Creation Date: 9-10-13/0221 OCP000036 |  | Orange County Correctional Medical Services Standardized Procedures for Registered Nurses, Section 1.B "Cardiac Arrest" OCP000224 |

| 9-9-13/2245 | Medical Emergency Response-Man Down in Mod C/Medical/Nursing staff: Brianna Garcia, LVN, Avelino Santos, RN, Scott Jordan, RN in charge | Medical Emergency Response Report OCP000026 OCP000096 | Check sheet shows:<br><br>**Chief Complaint:** "Man Down in Mod C".<br>**Medical History:** noted as Drugs and Heroin Abuse.<br>**Medications:** "Opiate W/D (withdrawal) protocol meds".<br>**Initial Assessment:** Airway patent; Breathing absent; Circulation absent; Unconscious; Temp cold; Color pale; Skin Dry; R & L Pupils dilated.<br>**Treatment given:** O2 (*illegible*) LPM (Liters per Minute) via BVM (bag valve mask).<br>Medical staff placed AED (automatic external defibrillator) and shock was not advised. Medical staff initiated CPR (cardiopulmonary resuscitation) at 2247.<br>**Secondary Assessment:** Neuro abnormal-unresponsive; Head abnormal-pale, no trauma; Neck WNL(within normal limits) – no JVD (jugular venous distention); Chest abnormal-no rise and fall, no breathing; Lungs abnormal-no breath sounds; Abdomen WNL, soft/nontender, no nausea/vomiting/diarrhea; Back/spine WNL-no signs of trauma; Pelvic WNL, no signs of trauma; Extremities abnormal- pale and cold.<br>**Glasgow Coma Scale:** performed twice. First time (*illegible*), second time at 2318. Each measure was 3.<br>**IV Therapy:** unsuccessful. No note as to number of attempts.<br>**Disposition:** Transferred to the hospital via paramedics @2318.<br>**Patient Condition upon Transfer:** Unconscious, pulse present (*notation illegible*), notation to "see narrative". | Request for Admissions, Set One, page 11: Request for Admissions No. 27: County will not admit that no Orange County Sheriffs deputies gave CPR to MG at any point in time. **There is no evidence of officers initiating CPR prior to arrival of medical staff.**<br><br>**By failing to initiate CPR, the officers showed inaction taken in conscious disregard of a substantial risk of serious harm.**<br><br>Orange County Correctional Medical Services Standardized Procedures for Registered Nurses, Section 1.B "Cardiac Arrest" OCP000224<br><br>Orange County Correctional Medical Services Standardized Procedures for Registered Nurses, Section 3.B "Emergency Oxygen Administration" recommends oxygen at 10-15 l/m per BVM. OCP000246<br><br>**The standards for this procedure appear to have been met.** |

| 9-9-13/2259 | AED removed | HeartStart Case Details Report Creation Date: 9-10-13/0221 OCP000036 | No shock recommended. Final EKG recorded at 2259. | Orange County Correctional Medical Services Standardized Procedures for Registered Nurses, Section 1.B "Cardiac Arrest" OCP000224 |
|---|---|---|---|---|
| 9-9-13/2300 | Medical Emergency Response-Man Down in Mod C/ Medical/Nursing staff: Brianna Garcia Avelino Santos, RN Scott Jordan. Deputies present: "unknown names" Arrival of Santa Ana Fire Department Engine #75 and C.A.R.E. Ambulance arrive and begin treating MG | Medical Emergency Response Report OCP000027 OCP000095 | **Medication Administered and Reassessment:** *"none"* Narrative: *"Received a man-down call from Mod C around 2245 hrs. Pt. was lying on the mattress in the hallway upon arrival by staff. Pt. was unresponsive, (-) breathing, pulseless, (+) (Illegible). AED attached but no shock advised. CPR initiated until paramedics arrived."* "Senior/Supervisor notified of event" by Scott Jordan. "MD notified of event" remains blank. AED data downloaded and printed by Scott Jordan. | Orange County Correctional Medical Services Standardized Procedures for Registered Nurses, Section 1.B "Cardiac Arrest" OCP000224 Per his deposition, Deputy Denney states he was trained in CPR as part of his job training with Orange County, P. 27, Line 11. States MG was housed on the top **bunk in his cell. P 40, Line 19, and P. 41, Line 25. Denney does not recall having received training pertaining to opiate withdrawal. P. 51, Line 1. Deputy Denny had no indication from medical that MG was on opiate withdrawal protocol.** P. 61, Lines 1-15. Denney does recall having training regarding opiate withdrawals. P. 64-69. Denney was aware MG was on Medical Watch based upon his Mod Card. P. 179, Lines 1-5. NCCHC Standard J-A-08: COMMUNICATION ON PATIENTS' HEALTH NEEDS (Appendix attached) states: "Communication occurs between the facility administration and treating health care professionals regarding inmates' significant health needs that must be considered in classification |

| | | | |
|---|---|---|---|
| | | | decisions in order to preserve the health and safety of that inmate, other inmates, or staff."<br><br>**The accepted standard of care was not met when correctional staff were unaware the MG was on withdrawal medications. From Orange County's ITP Policy #1322: "Security shall be informed of components of the treatment plan which are necessary to ensure appropriate care of inmates." (Bates stamp OCP000113)**<br><br>However, the deliberate indifference to the need for of continuity of care as evidenced by lack of indication to correctional staff that MG was at risk for opioid withdrawal shows the nursing staff was (1) aware of facts of MGs history and signs and symptoms from which an inference could be drawn that a substantial risk of harm or death caused by withdrawal existed; (2) actually drew the inference by putting him on withdrawal protocol; but (3) nevertheless disregarded the risk to MG's health by not advising correctional staff of the risk. |
| 9-9-13/2318 | Transferred to hospital | Medical Emergency Response Report OCP000026 | |
| 9-9-15/2335 | Pronounced dead/Dr. Khuu (reported by Deputy H. Denney) | Deputy's Report OCP000096 OCP000097 | |
| 9-13- | Autopsy performed | Orange County | Cause of Death: pending |

27

| | | | |
|---|---|---|---|
| 13/Joseph I. Cohen, M.D., Forensic Pathologist | and noted | Sheriff-Coroner Autopsy Report OCP000084-OCP000090 | Other Significant conditions: pending

Report notes multiple small scars on the dorsa of wrists and hands. Report notes needle tracks on left arm. Report notes a slightly enlarged and markedly dilated, floppy, 390 Gm. Heart. Other organs unremarkable. No traumatic injuries noted. Edema in legs/feet. |
| 9-13-13/Joseph I. Cohen, M.D. Forensic Pthologist | Final autopsy report created | Orange County Sheriff-Coroner Autopsy Report Dated 9-13-15 Assume final report No Bates stamp

Cohen handwritten notes as part of deposition exhibits | Cause of Death: Acute cardiorespiratory arrest due to chronic substance abuse from hypertrophy and dilation of the heart.

Other Significant conditions: Opioid (heroin) toxicity |
| 9-23-13/0838 | Receipt of final lab report | Precision Diagnostic Laboratory, Inc. OCP000091 | Lab report from eye vitreous fluid specimen drawn 9-10-15 at 16:10 shows abnormal readings of sodium, potassium, chloride, carbon dioxide, glucose, calcium, alkaline phosphatase, AST (SGOT), phosphorus, and LDH. |
| 12-3-13 | Receipt of toxicology report/Forensic Scientist: A. Figueroa | Orange County Crime Lab Toxicological Examination Report OCP000092 | Toxicology report which considered specimens submitted from postmortem peripheral blood, brain, liver, stomach contents, and urine. Findings indicate Morphine (free) was detected in blood and brain. Postmortem blood contained 0.058 mg/L Morphine (free) and morphine from brain could not be accurately quantified. Acetaminophen was indicated, but no second analysis was performed to confirm its presence. If confirmed, the acetaminophen would be consistent with levels reported as |

28

| 3-6-14 | Receipt of supplemental toxicology report/Forensic Scientist A. Figueroa | Orange County Crime Lab Toxicological Examination Supplemental Report OCP000093 | therapeutic. This report attempted to quantify the amount of Morphine (free) in the brain previously unquantifiable. Findings indicate 0.026 ± 0.003 mg/kg in the brain tissue sample. | |

# EXHIBIT C

THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN 256535)
Kelly Hatfield, Esq. (SBN 336377)
19800 MacArthur Blvd., Ste. 1000
Irvine, CA 92612
Telephone:  (949) 825-5200
Facsimile: (949) 313-5001
Email: Cameron@sehatlaw.com
Email: Kelly.h@sehatlaw.com

Attorneys for Plaintiff, Mary Gordon,
successor-in-interest for decedent,
Matthew Shawn  Gordon

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARY GORDON, successor-in-interest for decedent, Matthew Shawn Gordon, individually<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ORANGE; ORANGE COUNTY SHERIFF'S DEPARTMENT; ORANGE COUNTY SHERIFF-CORONER SANDRA HUTCHENS; ORANGE COUNTY CENTRAL MEN'S JAIL; ORANGE COUNTY HEALTH CARE AGENCY ROBERT DENNEY, an individual; BRIAN TUNQUE, an individual; BRIANNE GARCIA, an individual; DEBRA FINLEY, an individual; and DOES 5 through 10, inclusive, and DOES 1 thru 10, inclusive.<br>Defendants. | Case No.: 8:14-cv-01050-CJC-DFM<br><br>**DECLARATION OF REBECCA LUETHY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT DEBRA FINLEY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:     Hon. Cormac J. Carney<br>Date:      November 15, 2021<br>Time:      1:30 p.m.<br>Courtroom: 411 W. 4th Street, Santa Ana, CA |

-1-

## <u>DECLARATION OF REBECCA LUETHY</u>

I, Rebecca Luethy, declare as follows:

1.    I have been retained by Cameron Sehat, counsel for plaintiff in this lawsuit, to act as an expert witness for nursing and healthcare services. The opinions I state in this declaration are based upon my skills, knowledge, and expertise as a corrections nurse, and also my review of medical records, deposition transcripts, reports and other documents in this lawsuit.

2.    I have an M.S. degree in Nursing from SUNY Binghamton in New York. I have a B.S. degree in Nursing from Valparaiso University in Indiana. I am a Certified Correctional Health Professional with the National Commission on Correctional Health Care. I am currently self-employed as a nursing expert witness in the field of correctional health care. I have been employed by Centurion, LLC since 2011 and am the Vice President of Strategic Development. From 1985 to 2011, I was employed by Correctional Medical Services, Inc. or "CMS" (now Corizon Health), a privately held organization that provides healthcare services to prisons and jails nationally. I was Director of Business Development for CMS from 1995 to 2011. From 1985 to 1995,1 held various positions with CMS including Area Sales Manager, Clinical Programs Manager, Health Services and Administrator. I was a Staff Nurse with Our Lady of Lourdes Hospital in Binghamton, New York from February 1984 to July 1985 and before that I was a Staff Nurse for Mercy South Hospital in Fairfield, Ohio from September 1983 to January 1984.

3.    I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

4.    My opinions are based in part on my training, professional experience, and education, and are made to a reasonable degree of medical certainty.

5.    My qualifications to review this case are set forth in detail on Exhibit A.

6.  Before reaching my opinions in this case, I reviewed:  Defendants' Initial Disclosures Pursuant to Federal Rule 26 (Medical Chart); Defendants' First Supplemental Disclosures Pursuant to Federal Rule 26 (P & Ps); Defendants' Third Supplemental Disclosures Pursuant to Federal Rule 26 (Nursing Procedures); Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Production of Documents Set (Old and new COWS P & Ps); Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Admissions, Set One; Defendant County of Orange's Response to Plaintiff Mary Gordon's Request for Production of Documents Set Two (Requests for old P & Ps); Deposition of Thomas Le, D.O. (Mr. Sehat's deposition); Le Exhibits (Associated with Mr. Sehat's deposition); Deposition of Brianne Garcia, LVN (Mr. Sehat's deposition); Notice of Taking of Deposition of Brianna Garcia, LVN Nurse Interview Report from Orange County District Attorney; Deposition of Debra Finley, RN (Mr. Sehat's deposition); Finley Exhibits (Associated with Mr. Sehat's deposition); Deposition of Joseph I. Cohen, M.D.; Cohen Exhibits (Associated with Mr. Sehat's deposition); Deposition of Robert Denney, Deputy Sheriff Vol. I (Mr. Sehat's deposition); Deposition of Robert Denney, Deputy Sheriff Vol. II (Mr. Sehat's deposition); Denney Exhibits Vol. I (Associated with Mr. Sehat's deposition); Denney Exhibits Vol. II (Associated with Mr. Sehat's deposition); CD entitled "OCDA 1-402"; Ninth's Circuit's Court Opinion from July 26, 2021, Defendant Finley's Motion for Summary Judgment.

7.  Based on the foregoing, I have reached the following conclusions.

8.  The decedent, Matthew Gordon, was assessed by Nurse Finley at 6:47 p.m. on September 8, 2013, noting tremors, anxiety and agitation. A call was placed to the on-call physician Dr. Le, D.O., at approximately 11:00 p.m. on September 8th, who concurred that Mr. Gordon had a clear probability for opiate withdrawal symptoms, which can be fatal. Yet, the protocol initiated by Nurse Finley was for alcohol withdrawal. The wrong withdrawal assessment was initiated, as use of a

Clinical Institute Withdrawal Assessment for Alcohol (CIWA-ar) is inappropriate for opiate withdrawal. Had Mr. Gordon been assessed using an appropriate Clinical Opiate Withdrawal Scale (COWS), findings would have triggered a need for housing in the Medical Observation Unit (MOU) per County Detoxification and Treatment Policy #156. Multiple other inmates described Mr. Gordon's worsening opiate withdrawal symptoms on September 8 and 9, 2013, which ultimately led to his death. Based on the foregoing, it is my expert opinion that had a COWS assessment been used, Mr. Gordon's symptoms of an opiate withdrawal would have matched the criteria on the COWS assessment sheet mandating that a higher level of care be provided rather than the care that was, on paper, provided.

9.   Mr. Gordon was denied prompt medical care for his serious medical condition, and Nurse Finley disregarded and ignored his need to be seen by a provider/physician by failing to place Mr. Gordon on the Doctor's Sick Call list for 9/9/13, and disregarded and ignored Orange County Health Care Agency Correctional Medical Services (OCHCA) Policy #1320 entitled "Clinic Care" which states: "Physicians conduct sick call daily, seven days per week, at the central jail facilities." In addition, OCJ Policy #310 "Intake Screening and Triage" indicates when an Intake Screening and Triage Form is stamped with "Medical," as Mr. Gordon's was, the inmate requires "CHS prescriber evaluation." Mr. Gordon should have been evaluated by a prescriber on 9/9/13, since he had been prescribed withdrawal medications by a provider on 9/8/13. However, he was never evaluated in-person by a prescriber.

10. In Nurse Finley's deposition, she asserts that the CIWA-ar was the correct form to use to assess patients withdrawing from alcohol and opiates, despite having the COWS assessment available to her, and despite the fact that such an assertion goes against common sense and conscientious nursing practice. (Finley Depo 19:25-20:10; 64:8-13). She also acknowledged that the County no longer

uses this form, and now instead uses distinct forms for alcohol, opiates, and polysubstance withdrawal. (Finley Depo: 19:15-21:16).

11. The National Commission on Correctional Health Care recommends: "All inmates who screen positive should be formally assessed for opioid withdrawal within 24 hours" (NCCHC Guidelines 2013). Nurse Finley failed to follow this recommendation by choosing CIWA, or blindly acquiescing to Dr. Le's orders and going through the CIWA protocol instead of the COWS protocol, despite knowing that Mr. Gordon was going through opiate withdrawals. Therefore, Nurse Finley never formally assessed Mr. Gordon for opiate withdrawal, as she used the incorrect screening form for alcohol withdrawal instead of the correct screening form for opiate withdrawal--thus violating the 2013 NCCHC Guidelines.

12. Nurse Finley also disregarded and ignored the dangers of severe withdrawal  by disregarding and ignoring  OCHCA Policy # 1322 entitled Individual Treatment Plan which states: "Security staff shall be informed of components of the treatment plan which are necessary to ensure appropriate care of the inmate," and "Practitioners monitor treatment plan progress, including medications, labs, etc. through chart review and follow-up appointments," and "Housing recommendation will be communicated to security staff and shall consider: Regular housing when medically safe and appropriate, Sheltered Living housing for inmates with medical issues which may pose a risk to themselves or others if placed in regular housing, Medical Observation Unit housing for inmates with medical problems requiring more frequent medical observation, but not requiring hospitalization."

13. There is no indication that Nurse Finley ever communicated to the security staff that Mr. Gordon was going through opiate withdrawal, or informed security/medical staff what his treatment plan consisted of, nor did she monitor his treatment plan progress. Nurse Finley was aware that Mr. Gordon was going through opiate withdrawal, and based on her training of opiate withdrawal

symptoms, she should have placed Mr. Gordon in the MOU. (Finley Depo 26:5-7; 26:8-27:5; 27:10-14; 107:2-6). This is an especially important decision, as opiate withdrawal symptoms become worse over 6-12 hours, and require frequent medical observation. (Dr. Le Depo 58:11-60:18).

14. Detoxification and Treatment Policy # 156 states: "Detoxification is the medical process for extended treatment for those inmates experiencing withdrawal symptoms from drugs or alcohol. Long-term detoxification must occur in medical or general housing areas, under medical attention and monitoring."  Nurse Finley should have known that a once-daily assessment of Mr. Gordon by medical staff, per Dr. Le's orders, would be wholly inadequate medical care, as Nurse Finley is trained in opiate withdrawal. (Finley Depo 26:5-7; 26:8-27:5; 27:10-14; 107:2-6). Per basic training, severe symptoms begin 6-12 hours into the opiate withdrawal. (Dr. Le Depo 58:11-60:18). Thus, Nurse Finley should have ensured that Mr. Gordon was receiving proper medical attention and monitoring in the medical housing, as she noted that the general population housing is monitored less frequently than medical housing. (See Finely Depo135:7-10). If Defendant Finley had assessed Mr. Gordon using the proper medical screening form, the COWS assessment, the symptoms indicated on the form would have clearly required Mr. Gordon's admission to the MOU.

15. Defendant Finley indicated that based on her assessment of Mr. Gordon, she noticed a few acute withdrawal symptoms, which were indicated on her assessment ratings (Finley Depo 121:19-25). Detoxification and Treatment Policy # 156 also states "Those inmates assessed by the MD/NP who are exhibiting signs of acute withdrawal will be a medical expedite to the Infirmary." However, despite Mr. Gordon's signs of acute withdrawal, Nurse Finley never instituted a medical expedite to the infirmary.

16. The 2013 guideline for acute opioid withdrawal promulgated by the National Commission on Correctional Health Care (NCCHC) also focuses on

appropriate care and treatment: "Acute opioid withdrawal is common upon entry into correctional facilities, and, untreated, may result in needless suffering, interruption of life-sustaining medical treatments, and rarely, death." Because of Nurse Finley's use of the incorrect medical screening form for alcohol instead of opiates, failure to provide continuity of care to Mr. Gordon, and assignment to the general population housing (where she knew inmates were monitored less), Nurse Finley was a cause of Mr. Gordon's suffering and ultimate death. (Finely Depo 135:7-10).

17. Despite Nurse Finley's characterization as Mr. Gordon's situation being a "complex medical detox issue," that only a doctor can make any decisions about, Nurse Finley was the one to initiate and conduct the CIWA assessment, and determine the level of care Mr. Gordon needed. (Finley Depo: 21:17-22; 57:19-24; Dr. Le Depo 76:13-19; 77:20-78:9). As an RN, Finley has the authority to assess and make recommendations to incoming inmates, such as referring them to the MOU or general population (Finley Depo: 45:3-9; 113:2-9)--for which Nurse Finley did refer Mr. Gordon to general population. Nurse Finley indicated that this decision was made based on Dr. Le's findings and her own. (Finley Depo: 113:10-25; 114:8-11). However, as demonstrated by Dr. Le's testimony and the timestamp on the CIWA assessment and Dr. Le's order, this decision was based only on Nurse Finley's findings. Additionally, Nurse Finley indicated that she has the authority to refer a patient to the medical infirmary or hospital if needed. (Finley Depo: 114:19-115:1).

18. On-site nurses like Finley must have a greater level of training and education regarding assessment of medical needs, because they, not the physician, evaluate the patient in-person. Patient history and a list of signs and symptoms and vital signs are obtained and are relayed to the physician over the phone without the physician ever having seen the patient in person. Nurse Finley's and Dr. Le's characterization that Nurse Finley had no authority over Mr. Gordon's care is

clearly an inaccurate description of the reality of Nurse Finley's role in the jail. It was not reasonable for Nurse Finley to institute the CIWA protocol,  nor would it have been reasonable for Nurse Finley to follow orders for a CIWA protocol communicated by Dr. Le. If the captain of a sinking ship tells all passengers to stay onboard, common sense dictates to get off.

19. Defendant Finley indicated that she had gone through opiate withdrawal training (Finley Depo 26:5-7; 26:8-27:5; 27:10-14; 107:2-6). Part of a nurse's opiate withdrawal training includes learning about the process of opiate withdrawal and the timing of the onset of symptoms. Nurse Finley was aware that Mr. Gordon had a "medium to high" daily intake dosage at 3 grams (Finley Depo: 133:23-134:2), and based on the fact that she had received opiate withdrawal training, likely knew that severe symptoms usually start their onset 6-12 hours into the withdrawal. (Dr. Le Depo 58:11-60:18). Despite being equipped with this training, Nurse Finley designated Mr. Gordon into the general population section of the jail, where the severe onset of symptoms would not be closely monitored by medical staff, and the only other persons who monitor ill inmates are other inmates like "house-mouse" John Magar (Magar Depo: 31:11-18) (Finely Depo135:7-10). NCCHC standard "J-A-08: COMMUNICATION ON PATIENTS' HEALTH NEEDS" states, "Communication occurs between the facility administration and treating health care professionals regarding inmates' significant health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff." There is no evidence of communication between Nurse Finley and correctional staff regarding Mr. Gordon's serious health care needs when he was transferred to Mod C, except for the attachment of the Miscellaneous Message Slip on his housing card that indicted he should have a lower bunk.  A lower bunk was not given.  In cases where inmates are withdrawing from alcohol or other drugs, a lower bunk is indicted for safety, for access by medical personnel, and for patient comfort.

20. By placing a patient on a withdrawal protocol, Nurse Finley had a duty to evaluate the patient routinely. Because Mr. Gordon was not evaluated after the intake and CIWA assessment when he was placed on a withdrawal regimen, Nurse Finley chose to ignore the danger of severe withdrawal symptoms, notwithstanding the potential harm to Mr. Gordon. Had the COWS assessment been routinely performed by Nurse Finley, Mr. Gordon would have likely been referred to the MOU, and it is more probable than not that he would have been found to be in medical distress long before death.

21. Nursing staff have training to understand that there are different signs and symptoms associated with opiate withdrawal versus alcohol withdrawal. Once they have reported this information to a supervising clinician, they have a duty to take their concerns further if they believe that clinician's response is inappropriate or inadequate. Here, Dr. Le's order for the CIWA protocol was clearly wrong, as Mr. Gordon was not suffering from alcohol withdrawal, but from opiates, as indicated in Nurse Finley's initial intake. If Dr. Le gave this order for the CIWA, and then Nurse Finley conducted the assessment, Nurse Finley should have discussed the COWS option with Dr. Le. Despite Nurse Finley's assertion that the nurse's job is to follow "the doctor's orders, whatever they are." (Finley Depo: 53:23-25), Nurse Finley had an independent nursing duty to address this issue with Dr. Le and check that Mr. Gordon was receiving the proper medical screening for his opiate withdrawal. Nursing staff have an obligation to question orders and respectfully refuse to administer them when logic and common sense clearly dictate that the physician's medical decisions do not correspond to the patient's medical needs, and are wholly inaccurate to the type of ailment from which they suffer. Nurse Finley herself didn't even know why the COWS section was crossed out. (Finley Depo 63:7-11).

22. The decision by Nurse Finley to continue with the CIWA assessment instead of the COWS assessment was medically unacceptable under all of the

circumstances. Though Mr. Gordon may have had other substances in his system, in addition to opiates, making this a polysubstance issue, there is no logic in choosing the CIWA over the COWS, as CIWA fails to include recognition of symptoms associated with opiate withdrawal such as pupil size, bone/joint aches, runny nose or tearing, GI upset, yawning, and gooseflesh skin. Thus, the choice in treatment that was taken was medically unacceptable under the circumstances, especially since Mr. Gordon made Nurse Finley aware of his opiate dependency immediately during the intake process. Nurse Finley consciously disregarded the excessive risk to Mr. Gordon's health by using the wrong medical screening protocol to assess him, and by placing him in general population without proper, consistent monitoring that a medical observation unit could have provided.

23.    Based on the record of evidence, the symptoms indicated on the initial intake form performed by Nurse Finley contradicts the record of evidence. Mr. Wood, a fellow cellmate of Mr. Gordon's who shared the same cell when Mr. Gordon first entered the loop process, noticed that when Mr. Gordon first entered the cell, he looked sick, and Mr. Wood asked if he was okay. (Wood Depo 15:4-18.) Mr. Gordon responded that he was not okay, and that he was "dope sick" and Mr. Wood noticed that Mr. Gordon appeared sweaty, drawn out, shivering, shaking, pale, and was curled up in a ball. *(Id*. Wood Depo 19:9-24; 20:16-18). Additionally, Mr. Wood indicated that after an hour or hour and a half after being put into the loop, Mr. Gordon was given pills that he vomited approximately 20 minutes later. (Wood Depo 21:4-22:5). Mr. Lauffer, another cellmate of Mr. Gordon, who was in the same initial cell as Mr. Gordon when he first entered the loop process, stated that in the hour to hour and a half that he was with Mr. Gordon, Mr. Gordon told him that he was feeling "really sick" and noticed Mr. Gordon was continually dry-heaving. As these symptoms were apparent to other inmates when Mr. Gordon first entered the loop process, these symptoms were likely present during Nurse Finley's initial intake of Mr. Gordon. However, her

-10-

intake describes Mr. Gordon as not experiencing any withdrawal symptoms whatsoever. The symptoms described by other inmates are severe and warranted immediate medical attention and frequent medical monitoring. Thus, Nurse Finley failed to accurately portray Mr. Gordon's current opiate withdrawal symptoms during the intake process, therefore keeping pertinent information from Dr. Le about Mr. Gordon's condition, and failing to send him to the MOU, where he should have been housed in the first place.

24. Regardless if Nurse Finley conducted the CIWA before or after the orders were given by Dr. Le, it is clear that even while utilizing the incorrect form, the CIWA, the information on the form was also inaccurate--just like the intake health screening. In between the time of Nurse Finley's initial intake health screening and Dr. Le's orders (1847-2300), other inmates observed Mr. Gordon appearing very sick--shivering, shaking, sweating, vomiting, curled up in a ball and dry heaving-- and noticed these symptoms immediately upon his entrance into the loop. (Wood Depo 13:1-5; 15:4-18; 19:9-22:5; 26:6-14; OCDA 407-408). If these symptoms were indicated on the CIWA, this would have caused Mr. Gordon to enter the MOU. If these symptoms were indicated on the COWS, which would include those additional symptoms not on the CIWA (those are resting pulse rate, restlessness, pupil size, bone/joint aches, runny nose, tearing, GI upset, yawning, gooseflesh), Mr. Gordon would have immediately been admitted to the MOU for his opiate withdrawal symptoms.

25. Thus, based on the evidence in the record, it is clear that Nurse Finley did not accurately conduct a medical intake screening of Mr. Gordon on September 8, 2013. Failing to perform a COWS for a patient undergoing opiate withdrawal and inaccurately describing their symptoms during the medical screening process is a gross departure from the standard nursing practice, and results in a serious level of reckless disregard for the health and safety of the patients Nurse Finley was supposed to accurately screen.

26. Nurse Finley's conduct indicates that she made an intentional decision not to use the appropriate COWS form, despite knowing that Mr. Gordon was suffering from opiate withdrawals. Even under the wrong CIWA assessment, she deliberately failed to note the full spectrum of his symptoms as noted by other inmates in the "loop"; the failure to assess Mr. Gordon through the COWS protocol put Mr. Gordon at a substantial risk of suffering serious harm--as opiate withdrawal manifests differently than alcohol withdrawal and can result in death. Nurse Finley additionally failed to take any reasonable measures that were available to her to reduce this risk. These reasonable measures were: implementing the COWS protocol, accurately describing Mr. Gordon's symptoms during his medical screening, creating a plan of care or individual treatment plan that included assessment of Mr. Gordon by a provider/prescriber on 9-9-13; assuring additional monitoring of Mr. Gordon by nursing staff to provide continuity of care, per OCHCA Policy #1320; advising correctional staff of Mr. Gordon's special health care needs, per OCHCA Policy #1322; and discussing with Dr. Le that Mr. Gordon needed an opiate withdrawal assessment (COWS), not an alcohol withdrawal assessment (CIWA), as he was an opiate user experiencing opiate withdrawal symptoms, not an alcohol user experiencing alcohol withdrawal symptoms. There is no indication in the record that Nurse Finley took action on any of these readily available and reasonable measures. As a result of failing to take any of these actions, Nurse Finley was a cause of Mr. Gordon's ultimate death.

27. Therefore, the substandard care provided by Nurse Finley was a substantial and contributing cause of Mr. Gordon's death.

28. In my expert opinion, had Mr. Gordon been given the level of care and the proper medical screening that he obviously required, his death would have been prevented.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: _10/25_, 2021

*R Eluethy*

Rebecca Luethy

-13-